IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:05-CV-1416-D |
| VS. | § | |
| | § | |
| GREGORY A. BRADY, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

This is a Securities and Exchange Commission ("SEC") enforcement action that arises from revenue recognition practices of i2 Technologies Inc. ("i2") and that is not subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Two individual defendants——Gregory A. Brady ("Brady") and William M. Beecher ("Beecher")——move under Fed. R. Civ. P. 9(b) and 12(b)(6) to dismiss. The court denies the motions.

I

i2 Technologies Inc. ("i2") is a developer and marketer of computer software for the supply chain management industry.[1] Brady was i2's President, Chief Executive Officer, and a director, and Beecher was i2's Executive Vice President and Chief Financial Officer, during the relevant period. When i2 filed its 2002 Form

_____

[1]SEC originally sued Reagan L. Lancaster, but the parties entered into an agreed final judgment, filed March 27, 2006, after reaching a settlement.

10-K with the SEC, it not only reported 2002 results, it formally restated its results for the years 1999, 2000, and 2001 and the first two quarters of 2002.   According to i2, this was because, following a comprehensive review of revenue recognition practices, senior management changed the accounting for a number of transactions from revenue recognition under AICPA[2] Statement of Position ("SOP") 97-2, "Software Revenue Recognition," to revenue recognition under AICPA SOP 81-1, "Accounting for Certain Construction Type and Certain Production Type Contracts." According to i2, it made this determination because it concluded in some instances that its services were essential to the functionality of certain software products it licensed.   This change required that recognition of license, services, and/or maintenance revenue for the transactions be deferred and recognized in subsequent periods.   The net effect of the revenue adjustments was to decrease total annual revenue for 1999 by $130.9 million (or 21% of total revenue originally reported), for 2000 by $477 million (or 41%), and for 2001 by $137.6 million (or 14%).   Total revenue increased in 2002 by $385.8 million.   The cumulative impact of the revenue adjustments for the restatement period was to reduce revenue by $359.7 million, $232.4 million of which was deferred and could be recognized in the future.   i2 also adjusted expenses.   The cumulative impact of all revenue and expense adjustments for the

---

[2]American Institute of Certified Public Accountants.

- 2 -

restatement period was to increase net loss and decrease shareholder equity by $207.1 million.

SEC alleges that, during the four-year period ended December 31, 2001, and the first three quarters of 2002, i2 misstated approximately $1 billion of software license revenue, including over $125 million of revenue it never should have recognized. It specifies in its complaint several grounds to conclude that Brady and Beecher were at least severely reckless in disregarding that i2 was improperly recognizing revenue due, *inter alia*, to broad functionality problems that precluded up-front revenue recognition and was reporting revenue in i2's public filings that was materially overstated.

SEC asserts that Brady and Beecher are directly liable under § 17(a) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77q; § 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (2005); § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), SEC Rule 13b2-1, 17 C.F.R. § 240.13b2-1 (2006), and SEC Rule 13b2-2, 17 C.F.R. § 240.13b2-2 (2006); and SEC Rule 13a-14, 17 C.F.R. § 240.13a-14 (2006). SEC alleges that Brady and Beecher are liable as aiders and abettors of i2's violations of § 10(b) of the Exchange Act and Rule 10b-5, § 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13, and § 13(b)(2)(A) and (B) of the Exchange Act and Rules 13(b)(5)

and 13b2-1.  Brady and Beecher each move to dismiss this action
under Rules 9(b) and 12(b)(6).[3]

                                    II

    Because this action is brought by SEC, the heightened pleading
requirements of the PSLRA are inapplicable.  *See SEC v. Kornman*,
391 F.Supp.2d 477, 494 (N.D. Tex. 2005) (Lindsay, J.) ("Defendant
is erroneously relying on the heightened pleading standards from
private securities litigation under the [PSLRA]. These standards
only apply in private actions, and not SEC enforcement actions."
(citing cases)).  The court therefore follows the standards of
Rules 9(b) and 12(b)(6) that apply to securities fraud actions that
are not subject to the PSLRA.

    Rule 9(b) provides that "[i]n all averments of fraud or
mistake, the circumstances constituting fraud or mistake shall be
stated with particularity.  Malice, intent, knowledge, and other
condition of mind of a person may be averred generally."  Under
Rule 9(b), a complaint alleging fraud must specify the "'time,

_____

    [3]Brady and Beecher have also filed September 27, 2005 motions
requesting judicial notice, and both defendants have filed a
December 16, 2005 joint motion to strike.  The court grants their
motions to take judicial notice because, even considering the
documents in question, the court concludes that the motions to
dismiss must be denied.  In their motion to strike, defendants
object to SEC's reliance on documents related to the disposition of
a motion to dismiss in *Scheiner v. i2 Technologies, Inc.*, No. 3:01-
CV-0418-H, in which Judge Sanders denied a motion to dismiss
motions by Brady and Beecher to dismiss a securities fraud
complaint.  Because the court has not considered these documents in
reaching its decision, it denies the motion to strike as moot.

place and contents of the false representations, as well as the identity of the person making the misrepresentations and what [the person] obtained thereby.'" *Tuchman v. DSC Communic'ns Corp.,* 14 F.3d 1061, 1068 (5th Cir. 1994) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)). A plaintiff must "'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997)). In other words, the requirements are analogous to the first paragraph of a newspaper story, "namely the who, what, when, where, and how." *Melder v. Morris*, 27 F.3d 1097, 1100 n.5 (5th Cir. 1994) (citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). This Rule should be applied "with force, without apology." *Williams*, 112 F.3d at 178. "'[T]he particularity demanded by Rule 9(b) differs with the facts of each case[.]'" *United States ex rel. Wilkins v. N. Am. Constr. Corp.*, 173 F.Supp.2d 601, 613 (S.D. Tex. 2001) (quoting *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000)); *see Williams,* 112 F.3d at 178 (noting that "courts have emphasized that Rule 9(b)'s ultimate meaning is context-specific.").

Rule 9(b) is not intended, however, "to procure punctilious pleading detail." *Steiner v. Southmark Corp.*, 734 F. Supp. 269,

273 (N.D. Tex. 1990) (Fitzwater, J.). It serves neither "as a throwback to the hypertechnical pleading requirements of the Field Code nor requires needlessly repetitive pleading." *Id.* (citing *In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Litig.*, 467 F. Supp. 227, 251 (W.D. Tex. 1979) (Higginbotham, J.)). Rule 9(b) must be "'read in conjunction with [Rule] 8, which requires only a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Steiner*, 734 F. Supp. at 273 (N.D. Tex.) (quoting *Landry v. Air Lines Pilots Ass'n Int'l AFL-CIO*, 892 F.2d 1238, 1264 (5th Cir. 1990) (some internal quotation marks omitted)). Thus it must be viewed in light of Rule 8(a)'s goal of "simple, concise, and direct" pleadings. *Williams*, 112 F.3d at 178. As this court has said in non-PSLRA cases,

> [t]he court's key concern in assessing a complaint under Rule 9(b) is to determine whether the plaintiff seeks to redress specific wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs. The complaint must be sufficiently particular to show that the plaintiff is not seeking a license to go fishing for indicia of fraud.

*FDIC v. Gaubert*, No. 3-90-1196-D, slip op. at 7 (N.D. Tex. Sept. 4, 1990) (Fitzwater, J.); *see Am. Equitable Life Ins. Co. v. Transamerica Occidental Life Ins. Co.*, 1989 U.S. Dist. LEXIS 16540, at *11 (N.D. Tex. Dec. 21, 1989) (Fitzwater, J.).

"'[T]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'" *Kaiser Aluminum &*

*Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir. 1982) (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 598 (1969)). "[D]ismissal of a claim on the basis of barebones pleadings is a 'precarious disposition with a high mortality rate.'" *Id.* (quoting *Barber v. Motor Vessel "Blue Cat,"* 372 F.2d 626, 627 (5th Cir. 1967)). "The court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (per curiam) (Rule 12(c) decision) (citing *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir.1990)). "In analyzing the complaint, [the court] will accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (citing *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir.1996)). "The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim." *Id.* (citing *Doe*, 81 F.3d at 1401). "Thus, the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Id.* (citing *Vander Zee v. Reno*, 73 F.3d 1365, 1368 (5th Cir. 1996)).

III

SEC has satisfied its obligation to plead nonconclusory facts that "'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'" *Southland*, 365 F.3d at 362 (quoting *Williams*, 112 F.3d at 177-78).   The complaint specifically identifies SEC filings that Brady and Beecher signed, pleads specific facts that set out in detail why the filings falsely overstated i2's revenue, and specifically alleges why the statements were fraudulent.

Regarding scienter, when, as it must, the court considers the circumstantial evidence and assesses cumulatively all the pleaded evidence of scienter to determine whether, in toto, it raises an inference of scienter, *see, e.g., Fener v. Belo Corp.*, ___ F.Supp.2d ___, 2006 WL 832514, at *3 (N.D. Tex. Mar. 30, 2006) (Fitzwater, J.) (addressing PSLRA strong inference standard), it is pellucid that, even setting aside allegations that amount to improper group pleading,[4] the complaint at least pleads that Brady

---

[4]As the court explained in *Fener*,

> [i]n its traditional meaning, the term "group pleading" refers to a doctrine that allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.  In its original sense it is

- 8 -

and Beecher engaged in conduct that was at least severely reckless.

Severely reckless conduct consists of

> highly unreasonable omissions or
> misrepresentations that involve not merely
> simple or even inexcusable negligence, but an
> extreme departure from the standards of
> ordinary care, and that present a danger of
> misleading buyers or sellers which is either
> known to the defendant or is so obvious that
> the defendant must have been aware of it.

*Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001). The

complaint alleges repeated, specific instances in which Brady and

Beecher were made aware, or themselves acknowledged, that i2

software had functionality problems that precluded up-front

recognition of revenue. To cite just a few examples, according to

the complaint, Reagan L. Lancaster ("Lancaster"), i2's then-

President of Worldwide Operations, emailed Brady on February 17,

2000 complaining, *inter alia*, of i2's "bull___t demos" for

---

> conceptually related to the first element of a
> securities fraud claim——whether the defendant
> made a misstatement or an omission——not to the
> third element——whether the defendant acted
> with scienter. Nevertheless, the term "group
> pleading" is useful in describing the practice
> of improperly attempting to attribute scienter
> to a group of persons without enlightening
> each defendant as to the person's particular
> part in the alleged fraud.

*Fener*, ___ F.Supp.2d at ___ n.14, 2006 WL 832514, at *22 n.14
(citations and some internal quotation marks omitted). It is in
this scienter-related sense that the court refers to SEC's improper
group pleading. There are several instances in the complaint where
SEC has engaged in improper group pleading, and the court has
disregarded these allegations in determining with the complaint is
adequate.

prospective customers, stating that "you can only sell vapor for so long and then it catches you," identifying specific i2 products that were "vapor," acknowledging that i2 was "selling our stuff with a good pitch but there is no substance behind anything," and lamenting that apart from certain limited "real products," "[a]ll other things we have are vapor."  Compl. ¶ 30 (expletive redacted).[5]  He stated in the same email that i2 was "selling it and in some instances getting away with it," giving seven customer examples.  *Id*. at ¶ 31.  Lancaster advised Brady that "all deals have major hair on them and we could get extremely burned for delivery."  *Id*.  On March 28, 2000 Lancaster emailed Brady, Beecher, and others apprising them of specific products that "[did] not exist" and/or could not be shipped and were "causing Rev[enue] Rec[ognition] issues."  *Id*. at ¶ 34.  On March 29, 2000 Lancaster forwarded Brady, Beecher, and others an email titled "rev rec urgent."  *Id*. at ¶ 36.  This email notified Brady, Beecher, and Lancaster that "two products that are listed as production on our price list are not products."  *Id*.  The email's author further noted that another purported i2 product "doesn't exist as such" and should not have been on the price list.  *Id*.  In a February 2002

---

[5]The court has not, of course, analyzed SEC's complaint under the strong inference standard that applies in the context of the PSLRA, and this opinion does not necessarily guide how the court would assess the allegations if made in a case to which the PSLRA applies.  Nor has the court attempted to discuss in detail the numerous allegations of the complaint that support the inference that defendants acted with scienter.

deposition, Lancaster testified that Brady instructed him to commit "illegal" acts, including selling products "that didn't exist." *Id.* at ¶ 40. Brady ordered him to execute a business plan that he knew "could not work." *Id.* Lancaster testified that this was illegal because Brady was "hyping the stock and we knew that we couldn't make the number." *Id.* Lancaster testified to other "illegal" acts, including selling "products that weren't ready and recogniz[ing] revenue off of those products that shouldn't have been recognized." *Id.* at ¶ 41. On March 28, 2001 i2's general counsel advised Beecher of various product and functionality problems that prompted customers to demand their money back, and that it appeared i2 salespeople had "built expectations" or were actually entering into side agreements to deliver localized versions of i2 products. *Id.* at ¶ 45. On March 28, 2000 Lancaster emailed Brady, Beecher, and others complaining about i2's revenue recognition practices. *Id.* at ¶ 82. The subject line of the email was "Rev Rec BS," and Lancaster wrote that i2 had "totally confused our salesforce on what is and what is not bookable or revenue recognizable" and that he felt i2 was "having a great quarter and that we are playing games with the numbers." *Id.* Lancaster stated that "[w]e are so out of touch with reality and when we start cooking books on new ideas or new rules of conservatism then you confuse everyone." *Id.* at ¶ 83. He noted that i2 had recognized revenue on past deals that were "uglier than the most recent

- 11 -

deals." *Id.* When Beecher responded by voicemail on March 30, 2000, he stated: "Saw your email on rev rec. Will give you response but not in much detail. I don't think it is healthy to be sending back and forth detailed emails on things like rev rec." *Id.* at ¶ 84. On March 31, 2000 Beecher left Lancaster another voicemail in which he explained that i2 did not need the revenue from the Toyota transaction during the first quarter: He said, "[f]ortunately we are in position where we don't have to do that. I am going to try to prolong the flexibility on how to book that deal for as long as I can for the second quarter . . . . Depending how business is going next quarter we will make decision." *Id.* at ¶ 85.

Brady's contention that SEC's eighth claim——insider trading violations under § 10b and Rule 10b-5——is deficient because it does not specify the material nonpublic information that prompted his sales of i2 stock is misplaced. The complaint contains specific allegations concerning Brady's knowledge of i2 transactions in which revenue was improperly recognized, and of customer and functionality problems. *See, e.g.,* Compl. ¶¶ 87-97 (addressing Kmart software license agreement).

Beecher's assertion that the complaint does not contain allegations that he knowingly traded i2 stock at a time he possessed material nonpublic information also lacks merit. The complaint asserts that Brady, Beecher, and Lancaster sold tens of

millions of dollars of i2 securities on the basis of material nonpublic information, and that they knew or were severely reckless in not knowing the information in their possession was material and nonpublic and that their trading on the basis of the information was improper and in breach of their duties.   Compl. ¶ 191.[6] Considered in its entirety, the complaint identifies the material nonpublic information as at least including knowledge that i2 had substantial problems with the functionality of its software and customer satisfaction and was recognizing material license revenue from "vaporware."

SEC has also adequately pleaded that Brady and Beecher are liable as aiders and abettors in that it has sufficiently alleged facts that permit the conclusion that there was a securities violation by the primary party, Brady and Beecher had a general awareness of their roles in the violation, and they knowingly rendered substantial assistance in the violation.   *See Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1126 (5th Cir. 1988) (addressing Rule 10b-5), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989).

As to the books-and-records claims, SEC has adequately pleaded that defendants are liable as aiders and abettors of i2's violation

---

[6]Although the complaint in ¶ 191 uses the term "Defendants," it is clear that, in context, the reference is to Brady, Beecher, and Lancaster.  Paragraph 191 lies between ¶¶ 190 and 192, both of which specifically refer to all three individuals.

of the SEC rules in question based on i2's material misrepresentations of revenue and earnings and that Beecher committed a primary violation of Rule 13a-14.

The court need not decide whether SEC has adequately stated a claim under § 13(b)(5) of the Exchange Act based on a knowing lack of internal controls.  SEC pleads this claim under § 13(b)(5) in the disjunctive.  *See* Compl. ¶ 170 (alleging that defendants violated § 13(b)(5) by knowingly circumventing or knowingly failing to implement system of internal accounting controls at i2 or by knowingly falsifying i2's books, records, or accounts).  The aiding and abetting claim is likewise based on conduct that exceeds a knowing lack of internal controls.  *See id*. ¶¶ 186-87.  The court declines to dismiss this component of either claim at this preliminary stage.

### IV

It is apparent from defendants' motions that they have a very different view of what occurred at i2 and of their alleged culpability.  These are matters for resolution on motion for summary judgment or at trial.  SEC's complaint is not like others that the court has found deficient under Rules 9(b) and 12(b)(6).  The court has "gain[ed] an understanding from the complaint—unadorned by the embellishment and characterizations that a lawyer's pen can add through use of intensifiers, adjectives, and adverbs—of what [SEC] say[s] the scheme actually

was and how a given defendant played a part in it." *Fener*, ___
F.Supp.2d at ____, 2006 WL 832514, at *9.   When the court
"accept[s] the facts alleged in the . . . complaint as true and
constru[es] [the] allegations in the light most favorable to
[SEC]," *see Goldstein v. MCI WorldCom,* 340 F.3d 238, 244 (5th Cir.
2003) (citing *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 430 (5th
Cir. 2002)), the complaint details in specific and nonconclusory
terms severely reckless conduct by the President and Chief
Executive Officer, and Executive Vice President and Chief Financial
Officer, of i2 in recognizing revenue for software licenses
involving products with known functionality problems that were so
severe that high-level company employees were referring to them by
expletives and terms like "vapor" and were specifically discussing
revenue recognition issues that resulted from product flaws.   Nor
is this a case that involves a mere failure to follow Generally
Accepted Accounting Principles ("GAAP").   While "the mere
publication of inaccurate accounting figures, or a failure to
follow GAAP, without more, does not establish scienter," this is a
case in which SEC has adequately alleged at least that defendants
were "severely reckless in publishing such information." *Fine v.
Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990).

                         *      *      *

    Defendants' September 27, 2005 motions to dismiss are denied.

Their September 27, 2005 motions requesting judicial notice are

granted, and their December 16, 2005 joint motion to strike is

denied as moot.

    **SO ORDERED.**

    May 12, 2006.


                           _____
                           SIDNEY A. FITZWATER
                           UNITED STATES DISTRICT JUDGE