2. Baker Botts objects to Brady's blatant failure to comply with Federal Rule of Civil Procedure 45(c)(1); Brady has taken no reasonable steps to avoid imposing undue burden or expense on Baker Botts. For instance, Brady made no attempt to tailor the subpoena to discoverable information or to take into account that a significant portion of the matters requested have been produced to Brady already by the plaintiff, the Securities and Exchange Commission (the "SEC"). The result is that the subpoena purports to impose a substantial, unnecessary burden on Baker Botts.

3. Baker Botts objects to the subpoena as unreasonably and substantially duplicative of discovery already produced to Brady by the plaintiff, the SEC. Baker Botts understands that the SEC has already produced to Brady all materials related to this case that it, the Company, the Audit Committee, Deloitte & Touche, or any other person produced to the SEC.

4. Baker Botts objects to Brady's obvious (and admitted) attempt to use the subpoena as an end run on the discovery process in a criminal proceeding.

5. Baker Botts objects to producing materials protected from discovery by the attorney-client and work-product privileges.

6. Baker Botts objects to the subpoena on the grounds that it fails to allow a reasonable time for compliance and is overly broad in temporal scope. Two weeks is not a reasonable time to request compliance with a subpoena that purports to seek over five years of documents, including potentially thousands of internal Baker Botts' emails, hundreds of thousands of i2's (the "Company") documents, and essentially all documents relating to every single communication any person at Baker Botts, Deloitte & Touche or KPMG LLP has ever had contact with anyone from the Company (or that person's agents), irrespective of their relevance to this case. Baker Botts requested additional time to respond to the subpoena, but Brady refused.

7. Baker Botts objects to the subpoena because it is not reasonably calculated to lead to the discovery of admissible evidence. The subpoena seeks documents with no plausible relevance to this case, including, for example, documents relating to other matters Baker Botts handled for the Company that have no bearing on Brady or the issues in this case (employment matters, labor matters, corporate matters, intellectual property matters, etc.) and documents that cannot possibly contain evidentiary information.

8. Baker Botts objects to the subpoena because it subjects Baker Botts to undue burden and is overly broad and harassing. The subpoena purports to require every Baker Botts lawyer who ever worked on any matter for the Company or the Audit Committee to review every document, including, for example and without limitation, emails, correspondence, pleadings, discovery materials, draft agreements and SEC filings, in his/her possession relating to the Company irrespective of their relevance to this case. Because the substantial majority of these documents are not relevant and are privileged, the subpoena in essence seeks to require Baker Botts to create a privilege log for five years of irrelevant documents.

9. Given Brady's total disregard for the proper bounds of discovery, Baker Botts objects to creating and producing a privilege log of responsive privileged documents on the grounds that it would impose an undue and unreasonable burden on Baker Botts.

10. Baker Botts objects to the definition of "Baker Botts" because it includes persons and entities who are not agents or representatives of Baker Botts.

11. Baker Botts objects to Instruction 7 to the extent it seeks to modify the Federal Rules of Civil Procedure. Baker Botts will comply with the Federal Rules.

12. Baker Botts objects to producing metadata. Any documents that Baker Botts produces will be in hard copy or TIF format, and Baker Botts objects to producing documents in any other form.

**SPECIFIC OBJECTIONS**

**REQUEST NO. 1:**

All documents you produced or showed to government investigators, including representatives of the Securities and Exchange Commission ("SEC"), Department of Justice, U.S. Postal Inspector, or any other government entity in response to any formal or informal request concerning i2 or any of its current or former officers, directors, or employees.

**RESPONSE:**

Baker Botts objects to this request because this request is not reasonably calculated to lead to the discovery of admissible evidence and is overly broad; not all materials Baker Botts produced and/or showed to governmental investigators are relevant to this case. Baker Botts further objects to this request because it calls for materials protected from discovery by the attorney-client and work-product privileges and a confidentiality agreement. Baker Botts further objects to producing materials that were shown but not produced to the government. Baker Botts further objects to this request because Brady has access to all materials provided to the government through the SEC, the plaintiff in this case. Moreover, Baker Botts has produced no materials to the "government" that were not produced to the SEC; all discoverable materials produced to the government are therefore available to Brady through plaintiff. Baker Botts will not produce documents in response to this request.

**REQUEST NO. 2:**

All correspondence with the Securities and Exchange Commission, Department of Justice, or U.S. Postal Inspector concerning i2 or any of its current or former officers, directors, or employees.

**RESPONSE:**

Baker Botts objects to this request because Brady has access to and should request from

the SEC correspondence with the SEC, the plaintiff in this case. Baker Botts further objects to this request because it is not reasonably calculated to lead to the discovery of admissible evidence and is overly broad; not all correspondence with the SEC is relevant to this case. Baker Botts further objects because correspondence with the D.O.J. or the Postal Inspector is neither relevant nor properly discoverable. Baker Botts will not produce documents in response to this request.

**REQUEST NO. 3:**

All documents concerning your representation of the Audit Committee of the Board of Directors of i2.

**RESPONSE:**

Baker Botts objects to this request because it calls for materials protected from discovery by the attorney-client and work-product privileges and a confidentiality agreement. Baker Botts further objects because this request is not reasonably calculated to lead to the discovery of admissible evidence and is overly broad; not all materials relating to Baker Botts' representation of the Audit Committee are relevant to this case. Baker Botts further objects to this request as harassing and because responding would be unduly burdensome. Baker Botts further objects to this request because Brady has access to any discoverable documents through the SEC, the plaintiff in this case. Finally, this request is vague and does not identify with sufficient specificity the documents it seeks. Baker Botts will not produce documents in response to this request.

**REQUEST NO. 4:**

The Report to the Audit Committee of the Board of Directors of i2 dated July 3, 2002.

**RESPONSE:**

Baker Botts objects to this request because it is Brady's attempt to disguise his improper and concealed retention of the Company's privileged information. Baker Botts further objects to this request because it calls for materials protected from discovery by the attorney-client and work-product privileges. Baker Botts further objects because this request is not reasonably calculated to lead to the discovery of admissible evidence and is overly broad; this report addresses matters not relevant to this case. Baker Botts will not produce this document.

**REQUEST NO. 5:**

All documents concerning the Report to the Audit Committee of the Board of Directors of i2 dated July 3, 2002, including but not limited to all documents reviewed or relied upon by you in the preparation of the Report.

**RESPONSE:**

Baker Botts objects to this request because it calls for materials protected from discovery by the attorney-client and work-product privileges and a confidentiality agreement. Baker Botts further objects because this request is not reasonably calculated to lead to the discovery of admissible evidence and is overly broad; not all materials concerning the report are relevant to this case. Baker Botts further objects to this request as harassing and because responding would be unduly burdensome. Baker Botts further objects to this request because Brady has access to any discoverable documents (Company documents reviewed by Baker Botts, for example) through the SEC, the plaintiff in this case. Finally, this request is vague and does not identify with sufficient specificity the documents it seeks. Baker Botts will not produce documents in response to this request.

**REQUEST NO. 6:**

All documents concerning any interview or communication by you, KPMG LLP, or Deloitte & Touche LLP with any current or former i2 employee, officer, director, customer, prospective customer, supplier, consultant, auditor, accountant, attorney or agent concerning defendants, i2's products, i2's sales practices or i2's accounting, including any transcripts, notes summaries and correspondence.

**RESPONSE:**

Baker Botts objects to this request because it calls for materials protected from discovery by the attorney-client and work-product privileges and a confidentiality agreement. Baker Botts further objects because this request is not reasonably calculated to lead to the discovery of admissible evidence and is overly broad; not all the requested materials are relevant to this case. Baker Botts further objects to this request as harassing and because responding would be unduly burdensome; read literally, this request calls for essentially every document relating in any way to any communication any person at Baker Botts, Deloitte, or KPMG ever had with anyone relating to i2. Such documents include, for example, memoranda written by or depositions taken by Baker Botts lawyers relating to other matters handled for the Company by Baker Botts that have no bearing on Brady or this case. Baker Botts further objects to this request because Brady has access to any correspondence with the SEC through the SEC, the plaintiff in this case. Baker Botts further objects to this request because Brady can access third party information from those third parties as easily as from Baker Botts. Finally, this request is vague and does not identify with sufficient specificity the documents it seeks. Baker Botts will not produce documents in response to this request.

**REQUEST NO. 7:**

All documents concerning any interview or communication by you, KPMG LLP, or Deloitte & Touche LLP with any agent, consultant, lawyer, or private investigator of any current or former i2 employee, customer, prospective customer, supplier, consultant, auditor, accountant or attorney concerning defendants, i2's products, i2's sales practices or i2's accounting, including any transcripts, notes, summaries and correspondence.

**RESPONSE:**

Baker Botts objects to this request because it calls for materials protected from discovery by the attorney-client and work-product privileges and a confidentiality agreement. Baker Botts further objects because this request is not reasonably calculated to lead to the discovery of admissible evidence and is overly broad; not all the requested materials are relevant to this case. Baker Botts further objects to this request as harassing and because responding would be unduly burdensome; read literally, this request calls for essentially every document relating in any way to any communication any person at Baker Botts, Deloitte, or KPMG ever had with anyone relating to i2. Such documents include, for example, memoranda written by or depositions taken by Baker Botts lawyers relating to other matters handled for the Company by Baker Botts that have no bearing on Brady or this case. Baker Botts further objects to this request because Brady has access to any correspondence with the SEC through the SEC, the plaintiff in this case. Baker Botts further objects to this request because Brady can access third party information from third parties as easily as from Baker Botts. Finally, this request is vague and does not identify with sufficient specificity the documents it seeks. Baker Botts will not produce documents in response to this request.

**REQUEST NO. 8:**

All documents reviewed or prepared by KPMG LLP in connection with your investigation on behalf of the Audit Committee of the Board of Directors of i2.

**RESPONSE:**

Baker Botts objects to this request because it calls for materials protected from discovery by the attorney-client and work-product privileges and a confidentiality agreement. Baker Botts further objects because this request is not reasonably calculated to lead to the discovery of admissible evidence and is overly broad; not all the requested materials are relevant to this case. Baker Botts further objects to this request as harassing and because responding would be unduly burdensome. Baker Botts further objects to this request because Brady has access to any discoverable documents (Company documents reviewed by KPMG, for example) through the SEC, the plaintiff in this case. Finally, this request is vague and does not identify with sufficient specificity the documents it seeks, and it seeks documents not within Baker Botts' possession, custody, or control. Baker Botts will not produce documents in response to this request.

**REQUEST NO. 9:**

All internal Baker Botts documents, including but not limited to emails to, from or copied to Timothy Durst, Andrew Baker, Joseph Cialone, or Craig Adams concerning the defendants, i2's accounting sales practices or software products.

**RESPONSE:**

Baker Botts objects to this request as harassing and because responding would be unduly burdensome; read literally, this request calls for essentially every internal Baker Botts document sent to or from these gentlemen relating in any way to any i2 matter, whether or not that document relates to the representation of the Audit Committee or to this case. Baker Botts further objects to this request because it calls for materials protected from discovery by the attorney-client and work-product privileges. Baker Botts further objects because this request is not reasonably calculated to lead to the discovery of admissible evidence and is overly broad. Finally, this request is vague and does not identify with sufficient specificity the documents it seeks. Baker Botts will not produce documents in response to this request.

Dated:  May 3, 2006

Respectfully submitted,

Timothy S. Durst
State Bar No. 00786924
Stuart L. Cochran
State Bar No. 24027936
BAKER BOTTS L.L.P.
2001 Ross Ave.
Dallas, TX 75201
P:  (214) 953-6500
F:  (214) 953-6503

## CERTIFICATE OF SERVICE

I certify that on May 3, 2006, I served this document by certified mail to:

Michael J. Biles
Akin Gump Strauss Hauer & Feld LLP
300 W. 6th St., Suite 2100
Austin, TX 78701

Toby M. Galloway
Securities and Exchange Commission
Fort Worth District Office
801 Cherry Street, Suite 1900
Fort Worth, Texas  76102

Timothy S. Durst



ORIGINAL

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

CLERK, U.S. DISTRICT COURT
By _____
Deputy

---

**SECURITIES AND EXCHANGE COMMISSION,**   :

     Plaintiff,   :

     :

  v.   :

**GREGORY A. BRADY, WILLIAM M.
BEECHER, and
REAGAN L. LANCASTER,**   :

     Defendants.   :

---

Civil Action No.:   **COMPLAINT**

## 3 05CV1416-M

Plaintiff Securities and Exchange Commission alleges:

### SUMMARY

1.   This case involves a billion-dollar financial reporting fraud compounded by tens of millions of dollars of insider trading by three senior executives of i2 Technologies Inc. Defendants Gregory A. Brady, William M. Beecher and Reagan L. Lancaster are the former CEO, CFO and President of Worldwide Operations, respectively, of i2, a Dallas-based software provider with which the SEC settled related fraud charges in June 2004. Over the four years ended December 31, 2001 and the first three quarters of 2002 (the "restatement period"), i2 misstated approximately $1 billion of software license revenue, including over $125 million of revenue it never should have recognized. The largest and most egregious misstatements occurred in 2000 and 2001, when Defendants headed i2.

2.   Defendants played instrumental roles in the revenue tricks that led to i2's misstatements. Defendants knew or recklessly disregarded, for instance, that i2 was recognizing

*SEC v. Brady, et al.*
**Complaint**

1

material license revenue from "vaporware" (software that did not work), in some instances entering into undisclosed side agreements for the sole purpose of facilitating revenue recognition. Additionally, Defendants knew or recklessly disregarded that i2 was recognizing revenue from undisclosed "barter" transactions that had little economic substance or business purpose aside from manipulating i2's financial statements. For example, Defendants orchestrated i2's execution of an undisclosed barter transaction with Enron Corp. in 2000. This transaction amounted to little more than a check-swapping scheme that effectively enabled i2 to recognize its own cash as revenue.

3.      As detailed below, these senior i2 officials: (a) were well-versed in the generally accepted accounting principles ("GAAP") applicable to i2's business, including those governing upfront revenue recognition; (b) had enormous personal financial stakes in maximizing upfront revenue recognition; (c) knew – through numerous discussions and e-mail exchanges – of broad functionality problems afflicting i2 software; (d) understood that these functionality problems precluded upfront revenue recognition; and (e) employed an assortment of deceptive schemes, misrepresentations and fraudulent business practices designed to assure inappropriate upfront revenue recognition. Defendants' fraudulent practices ranged from half-truths and subtle deceptions to outright falsehoods and concealment. Defendants were personally involved in negotiating or executing side agreements that materially altered transaction terms, resulting in violations of i2 internal policy and GAAP. Defendants' improper revenue recognition scheme allowed them to reap tens of millions of dollars exercising options on, and selling, i2's grossly inflated stock.

4.      The Commission, in the interest of protecting the public from such fraudulent activities, brings this civil securities law enforcement action seeking a permanent injunction

against Brady, Beecher and Lancaster, enjoining them from further violations or aiding and abetting violations of the antifraud, reporting, record-keeping, lying-to-auditors and internal-controls provisions of the federal securities laws; barring them from serving as officers or directors of any public company; and requiring disgorgement of ill-gotten gains, plus prejudgment interest and civil monetary penalties as allowed by law.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77u(a)] and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(e) and 78aa].

6.      Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails in connection with the transactions described in this Complaint.

7.      Venue is proper in this Court under Section 22(a) of the Securities Act [15 U.S.C. §77u(a)] and Section 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa] because certain of the acts and transactions described herein took place in Dallas, Texas.

## DEFENDANTS

8.      **Gregory A. Brady** was president, CEO and a director of i2 during critical parts of the restatement period. He joined i2 in 1994 and served as its president from May 1999 to May 2001, when he was promoted to CEO. He served as CEO until April 2002 and remained an i2 director until October 2002. Brady, a self-described "renowned visionary in the application of technology to business problems," claims to have "guid[ed] [i2] from start-up to global leader in the business applications market." He resigned April 15, 2002 and currently is chairman and

CEO of a private Dallas company.  He also serves on the Board of Advisors for a private equity firm.  He declined to testify in the SEC's investigation.

9. **William M. Beecher** was an executive vice president and CFO of i2 during the entire restatement period and remained in that role during portions of i2's internal investigations of financial reporting improprieties.   Beecher joined i2 in May 1997 and ascended to CFO in May 1999.   A graduate of Cornell Law School, Beecher resigned January 1, 2004 and is believed to be unemployed.   Beecher asserted the Fifth Amendment privilege against self-incrimination and declined to testify in the SEC's investigation.

10. **Reagan L. Lancaster** joined i2's sales force in March 1995.  In 1999, he became i2's executive vice president of sales and in April 2001 he ascended to president of worldwide field operations.  Regardless of title, from 1999 until his termination on July 23, 2001, Lancaster reported directly to Brady and was the second-highest ranking operations executive at i2. Lancaster has publicly claimed that he (a) had responsibility for all of i2's revenues and more than half of its global employee population; (b) was a member of i2's executive committee; and (c) presided over record sales every quarter from when he joined i2 in March 1995.  Shortly after his departure from i2, Lancaster founded a software company.  He presently serves as its CEO and as an advisor to a technology recruiting firm.   Lancaster asserted the Fifth Amendment privilege against self-incrimination and declined to testify in the SEC's investigation.

**OTHER RELEVANT ENTITY**

11. **i2 Technologies, Inc.**, a Delaware corporation headquartered in Dallas, is a developer and marketer of enterprise supply chain management solutions, including supply chain software and consulting services.  i2's common stock is registered with the Commission under Section 12(g) of the Exchange Act and traded on the Nasdaq National Market during the relevant

period, before being de-listed in May 2003. i2's stock is now quoted in the Over-the-Counter

Pink Sheets, but is slated to resume trading on the Nasdaq National Market on July 21, 2005.

On June 9, 2004, i2 settled Commission charges that it violated the antifraud, reporting, record-

keeping and internal controls provisions of the securities laws, paying a $10 million civil penalty.

## FACTS

### A.    i2 Advances from Start-up Operation to Billion-Dollar Company

12.    In 1988, i2's founders created the company's first software program in a two-

bedroom Dallas apartment. Their work was groundbreaking in what later came to be known as

the supply chain management industry. i2 went public in April 1996 and thereafter reported

ever-increasing annual revenues, which grew from approximately $101 million in 1996 to more

than $1.1 billion in 2000.

13.    From approximately 1995 to 1998, i2's sales force – led by Brady and Lancaster –

tended to focus on selling i2's core, mature products into the industrial applications for which

they were designed. i2's revenue recognition model strongly favored recognizing all software

revenue immediately upon signing a license agreement and shipping the software to the customer

(also known as "upfront" revenue recognition). This model was generally appropriate for these

mature products as implemented in i2's core manufacturing customer base.

14.    By approximately 1998, however, Brady had determined to transform i2 from a

successful niche player into an industry titan. Brady's vision was to serve as chief executive of

the next Microsoft, Oracle or SAP. Brady's vision led i2 to consummate numerous acquisitions,

including a $68 million acquisition of Smart Technologies, Inc. in July 1999, a $390 million

acquisition of SupplyBase, Inc. in May 2000, and an $8.8 billion acquisition of Aspect

Development, Inc. in June 2000.

*SEC v. Brady, et al.*                                                        5
**Complaint**

15. In addition to advancing an acquisition strategy, Brady pushed for (a) development of new products to compete with more established software companies and (b) marketing i2's core products (typically bundled with other less-established products) into other industries, such as consumer retail, in which i2 had no track record of success. He also urged Lancaster and i2's sales force to aggressively market i2's software.

16. Even though Brady's visionary approach led to products of increased complexity that required extensive adaptation to meet customer needs, i2 clung to its revenue recognition model favoring upfront recognition of software license revenue. As detailed below, however, upfront revenue recognition was inappropriate for these types of increasingly complex, untested products that lacked essential functionality.

### B. i2's Accounting for Software Sales

17. AICPA Statement of Position 97-2, "Software Revenue Recognition" ("SOP 97-2"), specifies the circumstances in which a company may recognize software license revenue up-front, and when it must recognize such revenues under contract accounting principles. Software license revenue is generally recognizable up-front under SOP 97-2 if no significant production, customization or modification of software is required, if the remaining undelivered elements of the parties' arrangement are not essential to the functionality of the software and if the following four basic criteria are met: (i) persuasive evidence of an arrangement exists, (ii) delivery of the software has occurred, (iii) the vendor's fee is fixed or determinable and (iv) collectibility is probable. Other factors may further preclude up-front recognition under SOP 97-2. For example, in multiple element software arrangements, vendor-specific evidence of fair value must exist for up-front recognition of the delivered elements.

18. If significant production, modification or customization is necessary, or if the

services are essential to the functionality of delivered software, the vendor may not recognize software license revenue at the time of the sale but instead must apply contract accounting principles under Accounting Research Bulletin No. 45, *Long-Term Construction-Type Contracts* and AICPA Statement of Position 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts"* ("SOP 81-1").   *See* SOP 97-2, ¶ 7.   Ordinarily, contract accounting principles require the software seller to defer license revenue over future periods.

19.     In assessing whether software delivered to a customer possesses the necessary functionality for application of SOP 97-2, it is irrelevant that the customer physically possesses and may use the delivered software at the outset of the arrangement; what matters is whether the customer has been delivered software with the functionality it agreed to purchase under the software license.   If further significant services or modifications are necessary to permit the customer to effectively use the delivered software in the manner desired, then the seller is prohibited from up-front revenue recognition under GAAP.

20.     Brady and Beecher represented to the public and to i2's outside auditors that i2 adhered to these accounting principles.   For instance, Brady and Beecher signed and certified i2's annual reports for 2000 and 2001 on Form 10-K in their capacities as CEO and CFO.   Those annual reports contain footnotes to i2's financial statements describing i2's purported revenue recognition practices.   The footnotes, titled "Revenue Recognition," provide in part:

> Revenues consist of software license revenues, service revenues and maintenance revenues, and are recognized in accordance with Statement of Position (SOP) 97-2, "Software Revenue Recognition," as modified by SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition with Respect to Certain Transactions," and SEC Staff Accounting Bulletin (SAB) 101, "Revenue Recognition."

[i2 2000 Form 10-K, filed with SEC March 29, 2001; i2 2001 Form 10-K, filed with SEC March

26, 2002].   The 2000 footnote also states:

> *Software license revenues are recognized upon shipment, provided*
> *fees are fixed and determinable and collection is probable.*
> Revenue for agreements that include one or more elements to be
> delivered at a future date is recognized under the residual method.
> Under the residual method, the fair value of the undelivered
> elements is deferred, and the remaining portion of the agreement
> fee is recognized as revenue.   If fair values have not been
> established for certain undelivered elements, revenue is deferred
> until those elements have been delivered, or their fair values have
> been determined.   Agreements that include a right to unspecified
> future elements are recognized ratably over the term of the
> agreement.   License fees from reseller agreements are generally
> based on the sublicenses granted by the reseller and recognized
> when the license is sold to the end customer.   Licenses to our
> content databases are recognized over the terms of the agreements.
> Fees from licenses sold together with services are generally
> recognized upon shipment, provided fees are fixed and
> determinable, collection is probable, payment of the license fee is
> not dependent upon the performance of the consulting services *and*
> *the consulting services are not essential to the functionality of the*
> *licensed software.*

[*Id.*; emphasis added].   The 2001 footnote is virtually identical to the 2000 note.   Similar

footnotes appear in each quarterly report filed by i2 on Form 10-Q during the restatement period.

### i2's bias toward up-front license revenue recognition

21.   Large software license agreements provided the bulk of i2's revenue, and

securities analysts measured i2's performance by its license revenue growth.   As a result, i2's

revenue recognition policy was strongly biased toward up-front recognition.   i2's compensation

structure fostered this bias because employee compensation was overwhelmingly based on

revenue recognized in the current period.   Specifically, Defendants received stock options whose

value depended greatly on revenue recognition.

*SEC v. Brady, et al.*                                                                                          8
**Complaint**

22.     Additionally, Brady and Lancaster were compensated based on the amount of license fees recognized.  According to i2's internal policy for payment of commissions, commissions were paid only on "recognizable accounting revenue."  Hence, the entire organization focused on signing and structuring large license agreements to maximize up-front revenue recognition.  Defendants were financially motivated to assure that outcome.

23.     Up-front recognition under SOP 97-2, however, was inappropriate for many of i2's products during the restatement period.  By 2000, many of i2's products were not "off-the-shelf," which is defined under SOP 97-2 as "software marketed as a stock item that customers can use with little or no customization."  Instead, many i2 products were sophisticated enterprise solutions requiring significant effort to implement and scale to customer needs.  These products demanded extensive adaptation to unique customer specifications, which often required customization by i2 technicians.

24.     Accordingly, as Defendants knew or recklessly disregarded, license revenue for those transactions was ineligible for up-front recognition under SOP 97-2 and instead should have been deferred to future periods in conformity with contract accounting principles.  i2's failure to do so during the restatement period materially misstated its financial statements.

25.     Defendants knew these revenue recognition rules and understood the accounting implications of selling software lacking essential functionality.  Defendants each received revenue recognition training both before and during the restatement period while employed at i2.  Such training sessions occurred at least annually – for example, each January at i2's sales kick-off meeting attended by Defendants – and often with even greater frequency.  Brady and Beecher periodically certified to i2's external auditors that i2 recognized software license revenue in conformity with these principles.

*SEC v. Brady, et al.*                                                           9
**Complaint**

26. i2's policy involving "Revenue Allocation for Commission Purposes," dated April 1, 1998, governed Brady's, Lancaster's and i2's sales staff's receipt of commissions. The first paragraph of the policy provides:

> **Commissions Are Based on True Revenue**
> No revenue is commissionable unless it is true revenue. This is interpreted to mean recognizable accounting revenue. . . . Business characteristics which prevent revenue recognition are lack of significant functionality, payments received in excess of a year and others.

This policy was readily available to Defendants on i2's internal computer network, as were subsequent revisions or amendments to the policy.

27. Further, Lancaster's email from 2000 and 2001 indicate a thorough comprehension of revenue recognition requirements. For instance, Lancaster complained several times in 2000 about what he considered shifting revenue recognition milestones, depriving him and his sales force of immediate commissions. He also complained that, in his view, i2's external auditor at the time, Arthur Andersen LLP, applied SOP 97-2 too strictly and that he knew of other companies whose auditors were more lenient.

28. Additionally, in February 2001, Beecher helped create i2's internal "Overview of License Revenue Recognition Policies and Procedures." Thus, Defendants were quite knowledgeable about the revenue recognition rules governing i2's business.

C.    **Defendants' specific involvement in i2's fraud**

1.    **Defendants knew or were severely reckless in not knowing that many i2 products did not work without considerable customization and code-writing.**

29.    By the first quarter of 2000, Defendants had substantial information about the functionality problems plaguing i2 software, which precluded up-front recognition of full license fees for those products.  Indeed, Defendants themselves acknowledged these problems to their colleagues over the next two years.

### i2 selling "vapor"

30.    On February 17, 2000, Lancaster emailed Brady about i2 building "bullshit demos" for prospective customers that showed all functions working together, which was not reality.  Lancaster stated further that i2 was increasingly selling "pure vapor" (i.e., non-existent or non-functional software solutions), elaborating:

> I am not pointing fingers but I will tell you that you can only sell vapor for so long and then it catches you.  Right now we have vapor in CM [Customer Management, an i2 software product], Procurement, Marketplace deals, etc. ...  We are selling our stuff with a good pitch but there is no substance behind anything ... The only real products are SCM [Supply Chain Management, another i2 product], Weak collaboration products but we are selling this, TP, and Fulfillment.  All other things we have are vapor.

31.    Lancaster concluded, "We are selling it [non-functional software] and in some instances getting away with it.  For Example:  Alliant, Taylor Made, Fast Turn, UTC and Honeywell, Toyota, GM.  But all deals have major hair on them and we could get extremely burned for delivery."

32.    On March 2, 2000, Brady responded by e-mail:

Reagan have [i2's former Senior VP of Worldwide Sales Consulting] list all the products he believes are vapor. List them in 3 categories

> 1.) Nothing there but a story or at best a prototype.
> 2.) Weak in functionality and not competitive
> 3.) Seems to have something but can't show it because of the lack of demo's.

33.     Two weeks later, on March 14, 2000, after Lancaster lodged more complaints about i2 selling vaporware, Brady acknowledged these problems and stated, "It is now time to fix this issue."

34.     On March 28, 2000, Lancaster emailed Brady, Beecher and others:

> E marketing does not exist
> E Care does not exist
>
> We cannot ship anything.
>
> Template designer and workflow are not shipable (sic) either.
> This is causing Rev Rec issues.  These products are all on the price list.

35.     As Defendants knew, the price list purported to contain only those products that were generally available, functional and appropriate for revenue recognition.

36.     The next day, March 29, 2000, Lancaster forwarded Brady, Beecher and others an email titled "rev rec urgent."  This email notified Brady, Beecher and Lancaster that "two products that are listed as production on our price list are not products."  The email's author further noted that another purported i2 product "doesn't exist as such" and should not have been on the price list.

37.     Later, on September 5, 2000, after Nike experienced significant problems getting i2's software to work, Brady emailed his colleagues, "This is what I mean when I say we need to clean up our mess.  This architecture will put us out of the supplychain business."

*SEC v. Brady, et al.*                                                              12
**Complaint**

38.     On November 13, 2000, Lancaster again complained about the functionality problems with i2's software, stating "Our problem is that we build semi custom software and we develop (sic) or better said charge customers for building products and then the customer gets extremely upset and we have to reduce our bills or we have collection problems."

39.     Lancaster repeated his complaints in a June 20, 2001 email to Brady and Beecher (among others), telling them:

> we sell semi custom software causing difficulty in selling and delivering and there is no way to do 200 deals. Superior sales will not win when our product looks like shit. Imagine being a presales person today? How would you demo our products, How many GUI's [graphic user interfaces], How would you show integration, Too many products to be experts on. Imagine being a consultant? Basically, developing code in front of customers.

40.     In a February 2002 deposition, Lancaster testified that Brady instructed him to commit "illegal" acts, including selling products "that didn't exist." According to Lancaster, Brady ordered him to execute a business plan that he knew "could not work." This was illegal, Lancaster testified, because Brady was "hyping the stock and we knew that we couldn't make the number."

41.     Other "illegal" acts, according to Lancaster, included selling "products that weren't ready and recogniz[ing] revenue off of those products that shouldn't have been recognized." Lancaster has acknowledged complaining to Brady about i2 selling vaporware before he became president of worldwide operations in April 2001.

42.     All three defendants knew or were severely reckless in not knowing that "developing code in front of customers" and selling "vapor" and products "that didn't exist" precluded upfront revenue recognition and that revenue cannot be recorded on vaporware.

Lancaster, who did not take his complaints outside the company, was terminated a month after sending the June 20, 2001 email.

### i2 software "in very bad shape" and "a mess," leading to massive customer satisfaction issues

43.     On September 13, 2000, Brady was copied on a report about one of i2's software products that had been sold to the airline industry. The report concluded that "the product is in VERY bad shape on even the basic required functionality" and that this was "NOT just an airline specific issue." In other words, this product would not work for any user, let alone the specific airline customer.

44.     Then, in December 2000, Brady exchanged email with i2 developers about functionality problems with another i2 product, Rhythm Collaboration Planner ("RCP"). One of the developers told him on December 15, 2000, "RCP code is such a mess, the lesser (sic) said the better. Let not a few customers going live misguide you. I have a REAL BATTLE on front of me keeping the code base together and the customers live on an ongoing basis."

45.     On March 28, 2001, i2's general counsel outlined for Beecher various product and functionality problems leading to customers "demanding their money back." The general counsel's email included his observation that it appeared i2 sales people had "built expectations or actually entered into a [sic] side agreements (verbal or otherwise) to delivery [sic] localized [customized] versions" of i2 products. He noted that one of i2's customers was "asking for their money back due to [i2's] failure to deliver localized versions."

46.     As Beecher knew or was severely reckless in not knowing, side agreements to customize software products materially alter the terms of the sale and render upfront revenue recognition inappropriate. Beecher also knew or was severely reckless in not knowing that

GAAP precludes recognizing revenue on sales of non-functional products for which the customer has demanded a refund.

### Functionality a big problem for i2's software

47.    In October 2000, Brady and Beecher received email discussing pervasive implementation problems afflicting i2 software.  One email of October 20, 2000, recounted that "word was getting out on the street about how difficult it is to implement i2 software" and that salesmen were spending time addressing customer satisfaction issues instead of selling.

48.    Two other emails of October 12 and 31, 2000, detailed functionality problems with two customers.  The two customers were Volkswagen AG (with whom i2 had signed an $11.5 million license in July 2000, which i2 immediately recognized in full) and e-gatematrix (with whom i2 had signed an approximately $16 million license in December 1999, which i2 recognized in full shortly thereafter).

49.    On February 14, 2001, Lancaster received email detailing problems with certain products (RCP and TradeMatrix, a suite of products described *infra* ("TMX")) that i2 was trying to implement at Volkswagen and iStarSystems (an online auto-parts exchange affiliated with Toyota).  The email stated "Our products are not working and we are building them in the field.  Examples are RCP at VW and TMX platform at iStar.  We are in much worse shape on these products than most people are aware of."

50.    On February 15, 2001, Lancaster forwarded this message to Brady and others, "echo[ing]" these sentiments and passing on Toyota's "huge disappointment" with i2's efforts at iStar.  Lancaster noted that "nothing is working" at Toyota, though i2 sold Toyota software during the "first quarter last year."

51.     Around the same timeframe, Lancaster created and distributed to i2's executive committee a report detailing product issues.  In particular, on March 2, 2001, Lancaster emailed Brady (forwarded to Beecher on March 4, 2001) about various "major problems" experienced by specific customers.  Lancaster noted that i2 was "getting hit all over the place on customer satisfaction" and that this customer problem list was "very incomplete and only a fraction of customer problems."

52.     Lancaster's email detailed over 40 customers that had "revenue attached for this quarter" connected with "major [product] issues all over them."  For instance, Lancaster noted problems at Best Buy with a product known as Replenishment Planner because the product did not exist.   He also described numerous accounts with historical problems, write-offs, development delays, contingencies and requested returns of product.   Brady, Beecher and Lancaster never provided i2's external auditor with this email or these reports from sales.

53.     On March 10, 2001, just after these email exchanges, Lancaster gave part of an analyst presentation where he was responsible for addressing, among other things, customer satisfaction, which had become a significant topic to investors because of then-recent public grumblings about the functionality of i2's software by certain customers.  After describing i2's customer satisfaction as "good," Lancaster downplayed customer complaints, even though he knew (from, among other things, the Red/Yellow/Green reports discussed in the next section) that customers were unhappy because of broad functionality failures.

54.     Lancaster has described his March 10, 2001 presentation as an "illegal" act committed at Brady's behest.  As Lancaster has explained, i2 "had situations as large as Nike that had customer problems that we should have disclosed."

55.     Lancaster has testified that, during spring 2001, he and Brady spent some ten days on Brady's boat near the tropical island of Grenada, discussing broad customer satisfaction issues.  According to Lancaster, the two agreed that i2 would not introduce additional new products until i2 obtained "customer satisfaction and quality in our current product set."

56.     On March 1, 2001, Nike publicly blamed poor earnings on significant problems implementing i2's products.  This prompted a drop in i2's stock price and the filing of a flurry of private securities class actions on March 2, 2001.

### Red/Yellow/Green Reports

57.     In 2000, i2 instituted "Red/Yellow/Green" reports to address customer satisfaction and product issues.  These reports, which consulting and development department employees explained to Defendants at executive committee meetings, detailed the status of i2's software installation and customer satisfaction on a customer-by-customer basis.  "Red" indicated signified major customer or product problems and was given special attention.  i2's external auditor never received these reports.

58.     These reports identified critical functionality problems that Defendants knew or were severely reckless in not knowing precluded up-front recognition of license revenue for many i2 products.  Indeed, i2 later restated many of the deals earlier flagged as "red" on these reports.

59.     For example, an August 2000 report cited the Nike account as "red" because of "major functionality gaps."  Similarly, a March 2001 report indicated that "iStar views its products as beta" (*i.e.*, not commercially ready) and "Transora [another i2 licensee] feels as if it was sold a 'Content Exchange product that was nothing more than a vision at that time.'" i2 later restated all of these deals.

*SEC v. Brady, et al.*                                                                                                     17
**Complaint**

## The "fun deals" report

60.    In early 2001, Beecher commissioned the Revenue Recognition and Legal departments to analyze revenue recognition risks.  A product of this project was a document outlining "fun deals" and "bad deals."  This report identified problematic revenue recognition situations that existed at i2, including:

- Products are identified after the license is signed (typically during implementation);

- The wrong products are included in a deal and/or products are positioned incorrectly;

- New products;

- Underestimating the scope of implementation (intentional or otherwise);

- Development/customization activities without separate formal agreements;

- Willingness to do exchanges/swaps/credits for "customer satisfaction;"

- Barter-revenue evaporation; and

- Credits/New Deals (Credit an old deal and do a new deal shortly thereafter).

61.    The revenue recognition issues identified in the "fun deals" report pervaded the transactions that i2 later had to restate.  Specifically, the fun deals report identified revenue recognition issues present in transactions involving IBM, ATK, Nike, egatematrix, Siemens, Transora and other subsequently restated transactions.    i2's then-Director of Revenue Recognition briefed Beecher regarding these bad deals.

## The Cusumano report

62.    About the same time as the "fun deals" report, on June 5, 2001, Brady received the initial report of Michael Cusumano, a Massachusetts Institute of Technology professor whom

i2 had hired to analyze its structure and processes.  Professor Cusumano identified serious deficiencies across the organization, from failures in executive leadership and product and technology strategy to weaknesses in sales practices, product release management and quality assurance.  He specifically noted that i2's products largely had become custom software requiring significant post-license development and implementation services to meet customers' needs.

63.    Professor Cusumano interviewed dozens of i2 employees and summarized their comments.  Among the comments he included in his report were:

- "CRM group sold a product that doesn't work.  Called the 5x platform.  But the product breaks when scaled."

- "TradeMatrix Marketplace is a piece of junk.  More than e-vapor but it doesn't work.  Has serious scalability and performance problems."

- "Sales methodology: Live or die depending on mega-deals. They will never walk away from a large deal."

- "The company's historical priority has always been revenue growth, at any expense."

- "Two core competencies in i2: (1) Can sell anything to anyone.  And (2) delivery guys can make any piece of crap work, given enough time."

64.    In addition to these i2 employee comments, Professor Cusumano noted "over commitments to customers from executives and sales people on product functionality, dates, and the like;" "[o]ver-promising to customers on product functionality and ability to deliver custom features;" and selling "software that doesn't work."  Professor Cusumano recommended that i2 "enforce higher standards of functionality completion and testing coverage for systems that i2 releases and recognizes revenue on."

65.     None of Professor Cusumano's conclusions or observations came as a surprise to Brady or Beecher, who already knew about or had been alerted to these very software and customer problems. The revenue recognition implications of these conclusions and observations were obvious to Brady and Beecher, since they each knew that upfront revenue recognition was inappropriate under SOP 97-2 for software that did not work, was semi-custom or lacked essential functionality promised to the customer.

66.     In addition to the email and other communications described previously, the red/yellow/green reports and the "fun deals" report, Beecher had participated in an internal email discussion regarding problems with product development and Professor Cusumano's visit. This message was amplified in a November 20, 2001 email to Beecher excerpting the Cusumano report: "Executives over-promise to customers to get sales. Development organization is chaotic and product roadmaps are vague, so executives and Sales are not really sure what products do and what is coming. So executives can promise what they like. . .The promises become the roadmap."

67.     Despite the report's obvious revenue recognition implications, Brady and Beecher withheld it from i2's audit committee and external auditors. It was only in the later half of 2002 that Lancaster finally forwarded a copy to i2's audit committee in 2002 (more than a year after he had left i2), while he and another former employee were trying to discredit then-current management and take over the company. Upon finally receiving the report, the audit committee and auditors launched the investigation that ultimately led to i2's restatement.

### Aggressive exaggeration of functionality

68.     Defendants also knew that i2 exaggerated what its products could do, solely to close deals. As one sales representative later explained, i2 salespeople often demonstrated to

customers "what 'could' be done from a vision perspective" and that "in 2000 we were selling a lot of vision and futuristic strategies."

69.     The Cusumano report echoes these views, concluding that "Executives over-promise to customers to get sales. Development organization is chaotic and product roadmaps are vague, so executives and Sales are not really sure what products do and what is coming. So executives can promise what they like . . . The promises become the roadmap." Professor Cusumano's report further remarks that, "at the end of quarters, [i2 salespeople] beg customers for sales, and do deals that the development and consulting organizations have to swallow."

70.     Brady and Lancaster knew of and fostered these practices, though they blame the practices on each other. Brady, for example, has testified that Lancaster "had a history of claiming products did things that it (sic) didn't necessarily do." Lancaster, in turn, has testified that Brady instructed him to sell software "that didn't exist," from which Lancaster knew i2 would improperly recognize revenue.

71.     After these deals closed, i2 technicians were in many instances able to write code to create the promised functionality, but these efforts took much time, effort and expense, which frequently led to customer dissatisfaction. The level of customer frustration from the extensive customization efforts was made evident to Defendants through, among other things, the red/yellow/green reports and direct complaints from customers such as Nike, Kmart, Best Buy and others.

72.     Brady himself acknowledged these problems as early as April 18, 2000, when he emailed i2's head of development and consulting, complaining: ". . . we have lost touch with our implementations. In the last 2 day's (sic) I have heard more about problem implementations than I have heard about in the last 2 years combined."

*SEC v. Brady, et al.*
**Complaint**
21

73.   Given these substantial post-license development and modification activities, of
which Defendants were aware, i2 should have recognized revenue from these transactions under
contract accounting principles instead of improperly applying SOP 97-2 to record all such
revenues up-front.

74.   i2's "TradeMatrix" product, which was to be a suite of interrelated i2 software
designed to allow supply chain collaboration between customers and suppliers, was the poster-
child of the kind of futuristic "vision" products Brady and Lancaster championed in 2000 and
2001.   In early and mid-2000, i2 signed several customers to TradeMatrix licenses and
immediately recognized material license revenues therefrom.   i2's April 18, 2000 earnings
release gushed, "i2 Reports Record First Quarter Results Powered by TradeMatrix ™."   The
release specifically stated:

> Following its initial introduction in October of 1999, i2's
> TradeMatrix platform added multiple industry marketplaces. The
> company has been selected to power both private and public
> marketplaces with aggregate spending measured annually in
> trillions of dollars.
>
> Leading companies in automotive, aerospace, high-tech, consumer
> goods, apparel, timber, medical and logistics chose i2's
> TradeMatrix solutions to create new online marketplaces or to
> improve their existing trading relationships.

75.   A quote from Beecher also appeared in the release: "The growing demand for
marketplace solutions drove both current revenues this quarter and growth in our deferred
revenues."

76.   The problem, however, was that TradeMatrix did not work without extensive
customization.   This problem was recognized as early as April 16, 2000, when Beecher
forwarded a memo to Brady and Lancaster detailing concerns raised during a meeting with a
broad group of i2 operation managers.   The memo noted that "TradeMatrix functionality

*SEC v. Brady, et al.*
**Complaint**

22

currently missing key components such as transaction processing," without which it was of little use. In fact, TradeMatrix-based products were never readily usable by anyone without extensive customization and development.

77.    On June 8, 2000, Beecher emailed i2's Chairman about i2's price list, which purported to include only those products that were commercially available and functional. Beecher wrote that the "price list on tradematrix and marketplace services is considered a joke in the field . . . ." Beecher concluded, "this may also raise potential accounting issues. reagan (Lancaster) is aware of this."

78.    Professor Cusumano also referenced functionality problems with TradeMatrix in his report, explicitly describing TradeMatrix as a "particularly bad" "problem product." His report further noted the "lack of integration across i2 products" and that i2 had "[n]o common foundation or isolating layer for the various products, so this makes it difficult to handle combinations of technology stacks. To support everything, they have to do enormous amounts of tailoring. Can't integrate products without enormous efforts. And the integration is crude and ugly."

79.    Defendants never brought these facts to i2's external auditors.

### Earnings management

80.    As Lancaster has stated, i2 was "rarely conservative" in "recognizing revenue." Nonetheless, and despite its bias toward upfront revenue recognition, i2 did not always recognize revenue upfront.

81.    On March 14, 2000, less than one month after his email about "bullshit demos" and "pure vapor," Lancaster sent Beecher an email stating:

> What will 20m from Toyota and 30 m from IBM do to our balance sheet. *Won't this look hyper conservative and inconsistent.*

> Will our balance sheet have to be explained in detailed (sic). *Is
> our cookie jar to (sic) big for bad quarters.* Don't we have to tell
> financial analysts that we will recognize this rev and how.

(Emphasis added). Beecher responded, "let's discuss this off email."

82.     On March 28, 2000, Lancaster emailed Brady and Beecher, among others,
complaining about i2's revenue recognition practices. In the email, which had a subject line of
"Rev Rec BS," Lancaster wrote:

> We have totally confused our salesforce on what is and what is not
> bookable or revenue recognizable. I feel that we are having a great
> quarter and that we are playing games with the numbers. If we
> wanted to we could recognize IBM, Toyota, Posco, Warneco, etc. .

83.     Lancaster continued, "[w]e are so out of touch with reality and when we start
cooking books on new ideas or new rules of conservatism then you confuse everyone." In fact,
noted Lancaster, i2 had recognized revenue on past deals that were "uglier than the most recent
deals."

84.     On March 30, 2000, Beecher left Lancaster a voicemail, stating:

> Saw your email on rev rec. Will give you response but not in
> much detail. I don't think it is healthy to be sending back and forth
> detailed emails on things like rev rec.

85.     The next day, March 31, 2000, Beecher left Lancaster another voicemail,
explaining that i2 did not need the revenue from the Toyota transaction during the first quarter:

> We will not make any booking decisions on it for first quarter.
> Fortunately we are in position where we don't have to do that. I
> am going to try to prolong the flexibility on how to book that deal
> for as long as I can for the second quarter. . . . Depending how
> business is going next quarter we will make decision.

Lancaster has explained:

> . . . the summary of the IBM deal could have been recognized
> upfront. Toyota could have been recognized upfront. But through

> *financial engineering*, they came up with a way to recognize it
> over subsequent quarters.  To try to *smooth the revenue* of a
> quarter, if there's a quarter that's really big, what they'll do is,
> they'll try to come up with a creative way to differ the revenue so
> it doesn't look like we're recognizing it all at that time.

(Emphasis added).

### 2. Defendants' involvement in particular transactions where i2 improperly recognized license revenue

86.    In addition to being generally aware of functionality problems with i2 software and their obvious impact on revenue recognition, Defendants also directly participated in several transactions that plainly did not meet the requirements for upfront revenue recognition under SOP 97-2.  As Defendants knew, i2 nonetheless recorded revenue upfront from these transactions.

### a. Kmart

87.    On the last business day of the third quarter 2000, Kmart Corporation and i2 agreed to a $38 million license agreement for 13 software applications and related components to handle its retail supply chain.  i2's third quarter earnings release, dated October 17, 2000 and approved by Brady and Beecher, highlighted the Kmart agreement as "one of the largest contracts in i2 history."

88.    i2 immediately recognized $32 million as license revenue (it deferred the remaining $6 million to the fourth quarter because it did not ship a software product known as Promotion Planner until December 27, 2000), which constituted almost 16% of reported third quarter license revenue.

89.    Brady negotiated this agreement and sold Kmart some products that lacked functionality essential for any customer's use. He also sold Kmart products that, while proven to

*SEC v. Brady, et al.*                                                                      25
**Complaint**

work in the manufacturing sector, were untested and lacked critical functions for use in Kmart's retail industry.

90.     Brady and Lancaster admitted this lack of functionality in various internal communications, and were concerned about huge functionality gaps at Kmart and other retailers. For example, a May 10, 2001 email notified Brady and Lancaster that a certain i2 software "solution is lacking in functionality and scalability and is in trouble at . . . Kmart."

91.     The only remedy for these functionality gaps was for Kmart and i2 to write extensive code. Even then, however, i2 could not bridge all gaps. Kmart eventually wrote off over $55 million related to i2's products and services because they simply did not do what Kmart desired.

92.     Brady's actions during the Kmart negotiations reveal his state of mind toward revenue recognition. At one point, Kmart's representative in the negotiations raised numerous concerns about what i2's software actually could do and detailed what Kmart expected in terms of maintenance. Anticipating that further development would be necessary to deliver this functionality, she also proposed a joint development project, whereby i2 and Kmart together would develop a retail-oriented software solution to meet Kmart's needs and then share any revenues i2 earned from marketing the solution to others.

93.     Such arrangements are common in the enterprise-level software industry because customers typically are spending large amounts of money, and often contributing their own industry and technological expertise, to create large-scale software solutions that have potentially great value in the market. Under such arrangements, the parties will share the costs of developing the product and the license revenue the vendor secures from offering the product to

others in the market. But such arrangements ordinarily preclude upfront revenue recognition because such projects involve customization and development of essentially a new product.

94.    As the Kmart agreement was being negotiated at the end of September 2000, Brady orally acknowledged the Kmart representative's concerns and committed to ensure their oral agreements were included afterwards. The Kmart representative thus sent Brady an email the first business day after the quarter ended, October 2, 2000, titled "Kmart/i2 Verbal Agreements." Her email discussed, among other things, promises of additional services as part of the maintenance agreement and the proposed joint development project. In the email, the Kmart representative termed Brady's oral agreements "trust me's."

95.    Brady replied, "call me to discuss this please." In this call, Brady complained that what the Kmart representative had written endangered i2's ability to immediately recognize the full amount of the license fee as revenue.

96.    Brady preferred an undisclosed oral side agreement to accomplish the same objectives that he chided the Kmart executive for putting in writing. Brady never provided i2's external auditors with this email or details about his conversations with Kmart.

97.    By the middle of 2001, Beecher, Brady and Lancaster knew that problems with the Kmart software were tying up i2 consultants, who were trying to write new code to overcome functionality gaps. Beecher emailed Brady and Lancaster on June 19, 2001, regarding "the skinny on Kmart," noting how expensive this consulting (for which i2 could not charge Kmart) was becoming. Beecher's email informed Brady and Lancaster that i2 was "giv[ing] away" large quantities of services. Beecher, Brady and Lancaster never provided this information to i2's external auditors, which would have revealed that i2 had sold Kmart software that required significant customization and modification to meet Kmart's functionality needs.

*SEC v. Brady, et al*                                                                                           27
**Complaint**

b.   **Best Buy**

98.   During the second quarter 2000, i2 licensed Best Buy, Inc. a number of products and immediately recognized license revenue of $6.5 million (or approximately 4.3% of software license revenue for the quarter).   Like the Kmart transaction, i2 licensed software requiring significant development of additional functionality.   i2's project head for the Best Buy implementation recognized that the software licensed to Best Buy lacked business functionality that it should have had, such as inventory netting, and that the software had other problems that he considered "broken but not non-existent."

99.   One product with particular issues at Best Buy was Collaboration Planner ("CP"). On June 22, 2000, Brady left a voice message for Lancaster and others, warning "Guys this is regarding Best Buy, I'm not sure if you have heard Reagan's message yet.   Our CP does not work, we are failing."   Brady and Lancaster knew that upfront recognition of revenue was improper for a product that did "not work."

100.   Then, on February 6, 2001, Lancaster received an email regarding Best Buy indicating that i2's retail products are "immature" and "there are a thousand reasons why the products don't scale/meet the base requirements that our customers expect." Ultimately, these product problems and financial considerations led Best Buy to stop using many i2 software products.   Yet Brady and Lancaster took no steps to address these obvious revenue recognition issues.

101.   During the first quarter of 2002, i2 attempted to sell additional software to Best Buy.   Best Buy was understandably apprehensive about further purchases, given its past experience with i2.

*SEC v. Brady, et al.*   28
**Complaint**

102. On March 28, 2002, i2's then-Director of Revenue Recognition dialed into a conference call late and did not announce himself to the participants on the call. As he listened, i2 representatives, unaware that he was on the call, discussed "side agreements." The Director of Revenue Recognition brought this fact to Beecher, who expressed anger and surprise. Beecher pointed out that entering into such a side agreement was a violation of i2 policy and cause for termination. But when the sales representative was confronted, he explained that Brady (and the salesperson's immediate supervisor) had approved the side agreement. For this reason, he received no reprimand.

103. Despite knowing that improper revenue was being recognized due to a side letter that materially altered a transaction's terms, neither Brady nor Beecher took any remedial measures. Moreover, neither of them went back to review the terms of the 2001 Best Buy software sale.

### c. Corporate Express

104. On December 29, 2000, i2 and Corporate Express (an office and computer products supplier) entered into a $10.8 million license agreement covering a number of i2 products. i2 recognized the entire license fee as revenue during the fourth quarter of 2000, equal to 4.4% of quarterly software license revenue. Brady handled the negotiations for i2.

105. Bob King, Corporate Express's chief executive officer, negotiated the license for Corporate Express and has described the license agreement as part of a larger transaction that included a joint development project and i2's commitment to buy office supplies from Corporate Express. King and Brady also discussed forming a jointly held company that would sell Corporate Express products through TradeMatrix and i2's other marketplaces.

106. Among other things, Corporate Express needed software to handle many-to-many or multiple-vendor-to-multiple-customer transactions, mainly in connection with Corporate Express's business with UPS, one of its largest customers. Corporate Express wanted this software to be operational by April 2001. Brady acknowledged that Corporate Express's needs could not be delivered "out of the box" and, therefore, committed to deploy developers to Corporate Express to build the necessary functionality.

107. Consequently, Corporate Express expected i2 to deliver the development resources necessary to complete the work. Most significantly, Corporate Express expected i2 to provide development resources to create an Order Management System ("OMS"), which was to be the backbone to Corporate Express's electronic customer interface. But Corporate Express also feared designing and developing the OMS and then having i2 sell it to Corporate Express's competitors. Therefore, at the same time King and Brady were negotiating the license agreement, they also talked about creating a company to own any software i2 and Corporate Express jointly created.

108. Even as negotiations wound up in December 2000, the precise components and functionality of what Corporate Express was buying remained unclear. On December 21, King emailed Brady that the components of the software being purchased are "vague and still to be defined" and reminded Brady that i2 had to "guarantee that a mutually developed OMS will meet our requirements…"

109. Brady responded by email of December 21 that he was "fine" with this, and agreed to provide a detailed joint development agreement which would fix the price and schedule of deliverables. But he asked that this be done through a "separate" side agreement to aid i2's

recognition of license revenue, adding parenthetically, "[t]his ius (sic) the rev rec issue we discussed."

110.    He then advised King that functionality for some i2 products was not currently available, but would be available later.  Brady told King of a potential acquisition by i2 that would provide an "engine" capable of doing what Corporate Express needed.

111.    From this, Corporate Express concluded that i2 had oversold and over-promised its software's capabilities.  It nevertheless went through with the deal because Brady had agreed to the joint development project.

112.    On December 27, 2000, an i2 employee wrote in an email that Corporate Express desired more detail on the joint development agreement, "possibly a side letter providing more definition."  Brady replied, "1st off we do not do side letter's."  What Brady actually disapproved of, however, was the term "side letter," not the concept, to which he had already agreed.

113.    After i2 acquired RightWorks Corporation in 2001, Corporate Express signed an addendum on March 31, 2001, to the original software license agreement adding RightWorks software.  It then dropped the i2 software that lacked functionality and began implementing new RightWorks software.  Even then, however, i2 developers internally described the Corporate Express implementation effort as "likely the most significant software challenge anyone has ever undertaken in the history of software development."  Brady never told i2's internal accountants or external auditors these additional facts, though he knew or was severely reckless in not knowing that they precluded upfront revenue recognition.

### d.    Procter & Gamble

114.    Procter & Gamble ("P&G") executed a $5.7 million software license agreement with i2 on March 28, 2001.  i2 recognized the entire license fee as revenue in the first quarter

2001, equaling approximately 3% of software license revenue originally recorded for the quarter. Steve David, P&G's chief information officer, negotiated the software license agreement with Brady.

115.    The concept of P&G buying and using i2's software "as is" was never considered, because David told Brady that i2's products "as is" lacked functionality and would not meet P&G's needs without significant development and modification.   Brady responded that i2's software would provide the basis for a joint development project, to which David agreed on P&G's behalf.

116.    In a February 19, 2001 email, Brady wrote to Lancaster and others, "[r]ight now the only way to book revenue up front is to sell the license deal 1st with the JDP following 90 day's (sic) later. This can not (sic) be done at P&G."

117.    When the joint development project became an impediment to immediate revenue recognition, Brady orally committed to P&G to allow both parties to walk away from the deal and for P&G to get its money back if the joint development efforts failed.  P&G agreed, and Brady promptly emailed i2's accounting department on March 9, 2001, that "[t]he customer [P&G] will agree to eliminate language that would imply reliance on a [joint development project] for acceptance or other license contingencies, so we should be able to book as pure license sale."

118.    Brady knew or was severely reckless in not knowing that the contingent nature of this transaction rendered the upfront license revenue improper.  Brady structured the transaction to conceal these deal terms in an oral, undisclosed side agreement.  i2 internal accountants and external auditors did not know of the walk-away rights.

### e.     Enron Broadband Services

119.     During the first quarter 2000, i2 improperly recognized $10 million of software revenue from a barter transaction with Enron Broadband Services, Inc. ("EBS"), a subsidiary of Enron Corporation. Brady was i2's executive sponsor for the Enron account and, in early 2000, discussed with then-Enron President and Chief Operating Officer Jeff Skilling potential business opportunities between the companies, including linking an i2 software license agreement and an EBS broadband agreement.

120.     Toward this end, at Brady's instruction, on March 15, 2000, Enron entered into a perpetual license agreement with i2 for all commercially available i2 products (known at i2 as a "flex" license) for $10 million in license fees and $1.68 million first-year maintenance fees. i2 recognized the full $10 million as license revenue immediately (equal to 8.8% of software license revenue originally reported for the quarter). Simultaneously, i2 and EBS executed a separate agreement (the "EBS Broadband Agreement") committing i2 to "use best efforts to negotiate and sign by May 31, 2000 the appropriate documents to allow EBS revenue recognition of $11.68 million of service and product fees."

121.     Brady was the architect of the deal's structure. He has acknowledged under oath that he was "involved" in negotiating the transaction. When questioned whether this was a "barter transaction," Brady explained, "[t]here was some agreement that we would use some of their services, yes." i2's external auditors were not told of the overall structure, only about the software license agreement.

122.     In truth, Enron had no use for i2's software. It never attempted to implement it, a fact that was known among i2 salespeople reporting directly to Lancaster. As one i2 salesman

*SEC v. Brady, et al.*                                                  33
**Complaint**

emailed another on March 16, 2001, specifically referring to Enron, "if we sell a customer a 'bill-of-goods' and they later decide they have no use for our stuff, they will become dissat (sic) and will likely ask for their money back. If we never build an implementation plan and they never take the software out of the box, their ability to justifiably demand their money back is increased."

123.    Rather, the Enron software license was window-dressing, a "goodwill gesture" by Enron done at Brady's behest as a sign of the parties' earnestness in developing a long-term relationship. Of course, Enron expected i2 to help EBS make a big splash in the broadband market with a reciprocal commitment. As an i2 salesperson put it in a September 13, 2000 email to Brady and Lancaster, forwarded to Beecher three days later:

> I know you realize this, but . . . we have got to make them whole
> on approximately $12M worth of business. This is what they did
> for us back in March, with basically no questions asked.

124.    Knowing that the Enron license entailed linked, reciprocal obligations, Brady and Lancaster refused to pay normal commissions to the i2 salespeople who put the deal together, with Lancaster emailing salespeople on April 20, 2000 that, because this was a "barter" transaction, there would be a "penalty" on their commissions. Denying salespeople their commissions demonstrates that Brady and Lancaster knew the Enron deal lacked substance and generated no legitimate revenue. Lancaster later confirmed to i2's chief operating officer that i2 had committed to buy $10 million of broadband services from Enron.

125.    In the ensuing months, Enron pressed i2 to fulfill its bargain. On September 11, 2000, (among many other occasions), i2's chief information officer ("CIO") notified Beecher, to whom she reported, that i2's sales department insisted she find a way to buy more than $12 million of broadband services from Enron. Beecher then met with i2's corporate counsel and the

contracts administrator who signed the Enron agreements, from whom he obtained a copy of the EBS broadband agreement. Beecher and i2's corporate counsel told the contracts administrator that this was a "barter deal" from which i2 had recognized $10 million of license revenue. Beecher never notified i2's auditors of the EBS broadband agreement.

126.    Pressed to complete i2's commitment, the CIO examined opportunities to buy services from EBS. At first, she delegated negotiating responsibilities to a subordinate; however, following complaints from EBS, Beecher ordered the CIO to take over the negotiations personally because the subordinate "wasn't negotiating in good faith or ... was being too tough." The CIO proved no less tough, though, because she found EBS to lack experience in actually providing large-scale broadband services (she believed i2 was to be EBS's first customer) and to be exceedingly expensive (two and a half times the cost of i2's existing service).

127.    EBS's services were in any event going to be of doubtful value to i2; the CIO quipped to Beecher in a September 11, 2000 email that i2's commitment to buy $12 million of services from EBS was "a solution looking for a problem." As discussed more below, the CIO's concerns about EBS's capabilities proved well-founded.

128.    By August 2000, EBS and i2's sales department were angry and frustrated with the CIO's inaction. When the CIO passed this on to Beecher, he informed her by email dated August 22, 2000 that Enron's then-CEO, Ken Lay, had agreed to join i2's board and, therefore, i2 needed to complete a deal to buy services from EBS.

129.    The CIO complained that EBS was inexperienced and more expensive, but Beecher insisted she fulfill i2's commitment before the third quarter ended. Separately, Beecher also requested that i2 salespeople schedule a meeting with Enron's then-CFO Andy Fastow. By

*SEC v. Brady, et al.*                                                          35
**Complaint**

email dated September 13, 2000, the CIO notified Beecher and others that, though Enron was "considerably more expensive . . . Greg [Brady] worked out a deal that will work for us."

130.   Ultimately, however, the CIO refused to sign a contract with EBS, and Beecher instructed her to work out the technical details, adding he would take over and sign the agreement.   Brady then stepped in to lead a conference call with the CIO and EBS, and worked out general terms for the broadband agreement.   Beecher completed the negotiations and signed the agreement for i2 on September 27, 2000, just before quarter end.

131.   By March 2001, the CIO's fears about the inadequacy of EBS's services proved true, since i2 had to force a renegotiation of the EBS broadband contract due to EBS's inability to deliver the promised services.   By December 2001, EBS's services were effectively unusable. i2 finally terminated the broadband agreement in April 2002.

132.   i2's recognition of the full $10 million license fee in the first quarter 2000 was improper under GAAP.   Although the arrangement called for i2 and EBS to exchange cash and products, the cash exchange had no economic substance, since the parties were exchanging identical sums.   The cash exchange amounted to little more than a check-swapping scheme that effectively enabled i2 improperly to recognize its own cash as revenue.

133.   The EBS transaction was an intentionally structured "barter" deal, whereby i2 sold $10 million of software to Enron while committing to buy a reciprocal amount of broadband services from Enron.   In causing i2 to recognize the license revenue, Defendants wrongly promoted form over substance, in violation of GAAP.   *See, e.g., AU 411.06, The Meaning of 'Present Fairly in Accordance with GAAP'* (highlighting that the accounting for a transaction should reflect its substance rather than merely its form).

134.     A bedrock principle of GAAP is that "revenues are not recognized until earned."
*See* Statement of Financial Accounting Concepts ("SFAC") No. 5, ¶ 83(b); SAB 101, § A.1
(citing numerous accounting standards that confirm the fundamental proposition that "revenue
should not be recognized until it is ... earned").  Under GAAP, "revenues are considered to have
been earned when the entity has substantially accomplished what it must do to be entitled to the
benefits represented by the revenues."  *See* Statement of Financial Accounting Concepts
("SFAC") No. 5, *Recognition and Measurement in Financial Statements of Business Enterprise*,
¶ 83(b); Staff Accounting Bulletin No. 101 ("SAB 101"), § A.1 (same).  In other words,
revenues are "earned" only when the transaction represents the culmination of the earnings
process. *See* Accounting Principles Board Opinion No. 10, ¶ 12 ("revenues should ordinarily be
accounted for at the time a transaction is completed").

135.     As Defendants knew, i2's license sale to Enron was not the culmination of a
revenue recognition process as required by GAAP because, among other reasons, Enron had not
identified what products it wanted under the flex license (and never did so); some of the products
i2 licensed to Enron lacked essential functionality (i.e., did not work) absent extensive
customization and modification, which i2 never provided; and a condition to the overall
transaction was that i2 buy a reciprocal amount of broadband services from EBS, a condition i2
had not fulfilled as of the first quarter 2000.  In short, i2 had considerable remaining obligations
it was required to provide Enron before it "earned" the license fee.

136.     In addition, the exchange provided little, if any, real benefit to the parties.  Enron
got software it did not intend to, and did not, use, while i2 committed to buy enough broadband
(whether necessary or not, and of unproven quality and at excessive prices) merely to match

Enron's monetary commitment.   The absence of such benefit underscores the illegitimacy of the transaction.

137.    Moreover, i2's accounting did not satisfy the requirements of APB Opinion No. 29, *Accounting for Nonmonetary Transactions*, because i2 could not reasonably determine the fair value of the assets being exchanged within reasonable limits.  "Fair value should be regarded as not determinable within reasonable limits if major uncertainties exist about the reliability of the value that would be assigned to an asset received" in a barter transaction.  *Id.*, ¶ 26.  When i2 recognized the license revenue, the services it had committed to buy from EBS were undefined and, given that i2 was to be EBS's first customer and that EBS's price was well above market value, major uncertainties existed (and were expressed by the CIO, among others) about how i2 ultimately could realize the value of these services.

138.    Furthermore, when i2 recognized the license fee as revenue, it did not know what products Enron ultimately might use or whether, for instance, Enron intended to use products that Defendants knew or recklessly disregarded would need substantial modification or customization to provide essential functionality.  Therefore, i2 could not determine within reasonable limits the value of either what it was getting from EBS or what EBS intended to license from it, and its should not have recognized any license revenue from Enron in the first quarter of 2000, or at any point until i2's reciprocal obligation to EBS was fulfilled or eliminated (which did not occur until at least April 2002, when i2 cancelled the EBS contract).

139.    i2's own internal accounting policies, reviewed and approved by Beecher in January 2001, mandated this very result.  These policies expressly provided that, in the case of "[r]eciprocal [a]greements with the same customer" that were negotiated or executed within relatively short periods of time, i2 must recognize "zero license revenue" when, as here, "the fair

*SEC v. Brady, et al.*                                                                                      38
**Complaint**

market value" of the asset or service i2 received in exchange could not be determined. Beecher plainly knew of these internal policies when he signed i2's 2000 Form 10-K in March 2001, which included the Enron license transaction as license revenue.

140.    Moreover, i2's financial statements and Commission filings did not disclose the true nature of the EBS transaction. Beecher, Brady and Lancaster knew or recklessly ignored these facts, but did not disclose them to the public or Andersen.

> **D.    Despite knowing these problems, Defendants signed numerous public filings and representation letters or stood mute when reviewing quarterly revenue recognition figures with i2 accountants**

141.    Brady and Beecher knew from the above, or recklessly disregarded, that i2's revenue recognition practices were no longer appropriate and that its reported revenue was materially overstated. Nevertheless, they continued either to sign i2's public filings with the Commission during this period or to provide representation letters to i2's internal accountants or external auditors attesting to the propriety of i2's license revenue accounting. Specifically, Beecher signed each of i2's Form 10-K and 10-Q filings from the first quarter of 2000 through the second quarter of 2003. Brady signed i2's Form 10-K/A filing for 2000 (filed August 7, 2001) and its Form 10-K for 2001 (filed April 1, 2002). Between June 2000 and August 2001, Brady and Beecher signed multiple registration statements and amendments thereto on Forms S-3, S-4 and S-8, each incorporating by reference i2's false periodic reports, through which the company offered and sold securities to the public.

142.    i2's public filings routinely cited revenue growth, which Defendants knew or were severely reckless in not knowing was being recorded improperly. For example, the 2000 annual report on Form 10-K, as filed in amended form on August 7, 2001 (and signed by Brady and Beecher) ascribes revenue increase of 97.2% in 2000 and 54.7% in 1999 to "increased

*SEC v. Brady, et al.*                                                                 39
**Complaint**

demand for our products and services, the expansion of our product offerings, increased sales activities resulting from additional sales representatives and additional revenues generated by acquired businesses." The 2000 10-K also noted software license revenue increases of $356.6 million, or 101.1%, in 2000 and $118.3 million, or 50.5%, in 1999. These increases were attributed to increased demand, expansion of product offerings, increased sales activities and increased customer awareness and interest in i2's product offerings.

143.   i2's quarterly report on Form 10-Q for the first quarter of 2000, dated March 31, 2000, reports a revenue increase of "58% to $186.3 million for the quarter ended March 31, 2000 . . . ." The second quarter Form 10-Q claims revenue increases of "84% to $242.6 million for the three months ended June 30, 2000 . . . . [and] 72% to $428.9 million" for the first six month of 2000. And the third quarter 2000 Form 10-Q represents that "[t]total revenues increased 118.4% to $319.5 million for the three months ended September 30, 2000 . . . . [and] increased 89.1% to $748.4 million for the nine months ended September 30, 2000 . . . ."

144.   Similarly, i2's first quarter 2001 Form 10-Q notes a revenue increase of $170.3 million, or 91.4%, during the three months ended March 31, 2001 compared to the same period in 2000. Its second quarter Form 10-Q noted revenue decrease of $1.6 million, or 0.7%, and an increase of $168.6 million, or 39.3%, during the three and six months ended June 30, 2001, respectively.

145.   Brady and Beecher also approved numerous press releases during 2000 through 2002 that falsely presented i2's license revenue, and participated in conference calls and analyst meetings during this period where they concealed and misrepresented the true state of i2's financial condition. For example, on January 19, 2000, i2 reported "Record Q4 and 1999 results," noting a 55% revenue increase for 1999. On April 18, 2000, i2 reported "Record First

Quarter Results Powered by TradeMatrix (TM)," noting a 58% increase in first quarter revenues. On July 18, 2000, i2 reported "Record Quarterly Revenues Up 84 Percent to $243 Million." On October 17, 2000, i2 reported third quarter revenue growth of "118 Percent to $320 Million." On January 17, 2001, i2 declared, "i2 First e-Business Solutions Provider to Top $1 Billion in Annual Revenues with Announcement of Record," noting fourth quarter license revenue growth of "120% over 4Q 1999."

146.    On April 2, 2001, i2 tentatively announced "90 percent growth" in total revenues for the first quarter 2001 compared to the same period during 2000. Two weeks later, on April 18, 2001, i2 announced full results for the first quarter 2001, noting "86 percent" growth in license revenues over the first quarter 2000. Around the same time, during the second quarter 2001, Brady publicly stated that i2's earnings guidance was "conservative," though Lancaster and others within i2 had informed him that the sales projections, which i2 subsequently failed to meet, were unrealistic.

147.    Moreover, beginning the first quarter of 2001, i2 required certain key employees, including Brady and Beecher, to certify in writing, among other things, they were not aware of any issues that would preclude immediately recognizing revenue from an enumerated list of licenses i2 had signed during the quarter. i2's internal accountants relied on these "quarterly sign-offs" in preparing required records and filings.

148.    Similarly, for 1999, 2000 and 2001, Brady and Beecher signed management representation letters to Arthur Andersen confirming, among other things, that i2's revenue recognition during the relevant period was appropriate and comported with GAAP. For example, Beecher signed management representation letters dated October 13, 2000; January 16,

*SEC v. Brady, et al.*
**Complaint**

41

April 12, and October 10, 2001; and January 17 and April 11, 2002. Likewise, Brady signed management representation letters dated October 10, 2001 and January 17 and April 11, 2002.

149. The January 17, 2002 management representation letter, pertaining to i2's financial statements for the three years ended December 31, 2001 and signed by Brady and Beecher, is illustrative. In this letter, Brady and Beecher certified that: i2's 1999, 2000 and 2001 financial statements were "fairly presented in conformity with" GAAP; "all financial records and related data" had been "made available" to Andersen; and there were "no material transactions" that were improperly "recorded in the accounting records underlying the financial statements." Brady and Beecher also certified that there had been "no fraud involving management" or other employees that could be material to i2's financial statements, despite the allegations in a letter by a Lancaster associate of "potential wrongful behavior by management." In fact, as Brady and Beecher knew or recklessly disregarded, these representations were false.

150. Brady, Beecher and Lancaster also participated in quarterly meetings with i2 internal accountants to review the quarter's license deals. These meetings were part of the process i2 accountants followed to prepare i2's required reports and filings and were aimed at ensuring accurate information and that side deals, development issues, customization requirements or other revenue recognition-defeating features were not present. Defendants failed to inform i2's accountants of the functionality problems experienced by i2 as described, for example, in Lancaster's February 17, 2000 email.

E. **i2's internal investigations**

151. Brady and Beecher never brought the broad functionality problems and their obvious implications on i2's revenue recognition processes and financial statements to i2's auditors, Board of Directors or audit committee. Likewise, Lancaster did not disclose those facts

recognition of license, services and/or maintenance revenue for these transactions must be deferred and recognized in subsequent periods. The deferral and related revenue recognition is based on the applicability of either the percentage of completion method or the completed contract method of accounting. As discussed in more detail in Note 1 — Summary of Significant Accounting Policies in the accompanying Notes to Consolidated Financial Statements, the percentage of completion method requires revenue to be recorded as the implementation is completed and the completed contract method requires revenue to be recorded only when we have satisfied all of our product and/or service delivery obligations to the customer.

We do not have "fair value" for our license revenue as a result of our varied discounting practices. Accordingly, under SOP 97-2 we have recognized revenue under the residual method as described in Note 1 — Summary of Significant Accounting Policies in the accompanying Notes to Consolidated Financial Statements, which has prevented us from allocating license revenue among the individual products licensed to a customer. As a result, if a determination is made that our services are essential to the functionality of any single software product or group of products licensed to a customer as part of a larger bundle of our software products, then the license, services and/or maintenance revenue associated with the entire bundle must be accounted for in accordance with SOP 81-1. This is so even if the software product for which our services are essential has not been implemented by the customer. As a result of this treatment, in numerous situations we have deferred all license, maintenance and/or services revenue associated with transactions in which our customers have implemented many parts of a software bundle and have paid us in full.

In these situations, we have deferred license, services and/or maintenance revenue because the customer retains the license right to the non-implemented software product for which our services have been deemed to be essential. Once payment from the customer is received, these amounts remain on the balance sheet as deferred revenue until an event occurs to allow revenue to be recognized under SOP 81-1. There are a limited number of transactions that remain in deferred revenue at December 31, 2002 in which certain non-implemented software products for which services are essential are no longer being licensed by us. In these cases, we believe it is unlikely that the customer will implement these software products, although most are using other products and services from us. While we will attempt to resolve these