```
 1                    IN THE UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF TEXAS
 2                             DALLAS DIVISION

 3   SECURITIES & EXCHANGE          *    Case No. 3:05-CV-1416-D
     COMMISSION                     *
 4                                  *
          Plaintiff,                *
 5                                  *
                                    *
 6            vs.                   *
                                    *
 7   GREGORY A. BRADY, et al        *
                                    *
 8                                  *    Dallas, Texas
          Defendants.              *    January 25, 2006
 9

10

                     HEARING ON MOTION FOR PROTECTIVE ORDER
11                        BEFORE HON. IRMA RAMIREZ
                             U. S. MAGISTRATE
12

13

      APPEARANCES:
14
     For Plaintiff:                 MR TOBY M. GALLOWAY
15                                  MR. MARSHALL GANDY
                                    U.S. Securities & Exchange
16                                     Commission
                                    Burnett Plaza, Ste. 1900
17                                  801 Cherry Street
                                    Fort Worth, TX 76102
18                                  817-978-6447

19   For Intervenor Pltf Deloitte: MR. MATTHEW R. STAMMEL
                                    Vinson & Elkins
20                                  Trammel Crow Center
                                    2001 Ross Ave., Ste. 3700
21                                  Dallas, TX. 75201
                                    214-220-7700
22
     For Defendant Brady:           MS. MARY L. O'CONNOR
23                                  MR. EDWARD S. KOPPMAN
                                    Akin Gump Strauss Hauer & Feld
24                                  1700 Pacific Ave., Ste. 4100
                                    Dallas, TX 75201
25                                  214-969-2800
```

```
 1    For Defendant Beecher:            MR. MICHAEL P. GIBSON
                                        Burleson Pate & Gibson, LLP
 2                                      900 Jackson St., Ste. 330
                                        Dallas, TX 75202
 3                                      214-871-4900

 4    For Defendant Lancaster:          MR. ERIC DONOVAN PEARSON
                                        Heygood Orr Reyes Pearson &
 5                                        Bartolomei
                                        2331 W. Northwest Hwy.
 6                                         2nd Floor
                                        Dallas, TX 75220
 7                                      214-526-7900

 8    For Intervenor i2:                MR. JIM WELCH
                                        Brown McCarroll
 9                                      2001 Ross Ave., Ste. 2000
                                        Dallas, TX 75201
10                                      214-999-6100

11
      Transcription Service:           MS. BETTY TATE
12                                      3101 Townbluff Dr. No. 923
                                        Plano, TX 75075
13                                      972-596-9442

14

15

16
      Proceedings recorded by electronic sound recording;
17
      transcript produced by transcription service.
18

19

20

21

22

23

24

25
```

```
 1                      P-R-O-C-E-E-D-I-N-G-S
```

 2          **THE COURT:**   We are here in the matter of

 3   Securities & Exchange Commission vs. Gregory A. Brady, et

 4   al, Case No. 3:05-CV-1416-D.  Before the Court this morning

 5   is the Motion of i2 for a Protective Order to preserve the

 6   confidentiality of documents and for expedited consideration

 7   filed January 13th, 2006, as well as a related memorandum of

 8   law and appendix.  These pleadings were referred to this

 9   Court pursuant to the District Court's Order of Reference

10   signed January 17th, 2006.

11          Also before the Court is Deloitte & Touche LLP's

12   Motion to intervene for the limited purpose of seeking a

13   protective order, Motion for Protective Order, and Brief in

14   Support filed January 17th, 2006, with related appendix, and

15   this was also referred to this Court pursuant to the

16   District Court's Order of Reference signed on January 18th,

17   2006.

18          The Court has before it and has considered

19   Defendants' response to i2 Technologies, Inc.'s and Deloitte

20   & Touche's Motions for a Protective Order filed January 23rd,

21   2006, and also Plaintiff's Response and Brief in Opposition

22   to i2 Technologies, Inc.'s Motion for Protective Order,

23   Plaintiff's Response and Brief in opposition to Deloitte &

24   Touche, LLP's Motion for Protective Order, and the related

25   appendix filed January 23rd.

1          And if counsel would please make their appearances

2     for the record.

3          **MR. GALLOWAY:**  Judge, Toby Galloway for the

4     Plaintiffs, Securities & Exchange Commission.

5          **MR. GANDY:**  Marshall Gandy for the SEC.

6          **MR. WELCH:**  Jim Welch for i2 Technologies.

7          **MR. STAMMEL:**  Matt Stammel, counsel for Deloitte &

8     Touche.

9          **THE COURT:**  Normally I would take the first filed

10    motion first but given that i2's motion I think is going to

11    take more time, I'd like to go ahead and take up the

12    Deloitte & Touche's motion, and it appears from the

13    certificate of conference that the motion to intervene for

14    the purpose of seeking the protective order is not being

15    opposed.  Is that correct?

16         **MR. GALLOWAY:**  That is correct, Your Honor.

17         **THE COURT:**  All right.  So the motion to intervene

18    for the limited purpose of seeking a protective order is

19    granted.

20         Now, it appears that the Defendants do not object

21    to the entry of a protective order.  The sole dispute is as

22    to the terms, certain terms of the protective order, and the

23    only opposition being asserted is being asserted by the SEC,

24    so Mr. Galloway, I'd like to hear from you with regard to

25    why you oppose entering a protective order as to LLP –

1  Deloitte & Touche LLP's motion.

2       **MR. GALLOWAY:**  Yes, Your Honor.  On Deloitte &

3  Touche, we recognize that there are some cases that hold

4  that certain proprietary information can be afforded

5  protective status.  The SEC, however, does not have any such

6  information in its possession; we didn't request it during

7  our investigation.  We simply don't think we need it.

8       The types of materials I'm talking about are

9  things like audit manuals, planning guides and check lists,

10  things that are general from like Deloitte & Touche

11  information as opposed to specific client-related

12  information relating specifically to i2's misstated

13  financial statements.

14       What we have is a large, very large volume of e-

15  mail from i2, and as set forth in our paper in response to

16  i2's motion for protective order, we don't think any of that

17  material is confidential or subject to any sort of

18  protective order.

19       Now, there may be some documents in the Deloitte &

20  Touche materials that haven't been specifically identified

21  by Deloitte & Touche, but there may be some that have some

22  incidental reference to - that Deloitte & Touche's audit

23  methodology.  We don't think that the material we have

24  actually would – you know, would contribute to a competitor

25  understanding what Deloitte & Touche's audit methodology is.

1   It simply would just reflect what Deloitte & Touche did on

2   this particular single instance of audit work, and so under

3   the case law – and I would refer to the Court the case we

4   cited in our opposition to Deloitte & Touche's motion to

5   protect – I'm not sure of the pronunciation of this but I

6   believe it's Houbegent (phonetic) v. Development Specialist,

7   Inc.  The Court there said documents that reveal Deloitte's

8   auditing procedures and methodology may properly be

9   designated as confidential.  However, Deloitte may not

10   simply designate its entire production, which Deloitte

11   admits contains materials that are not protected under Rule

12   26(c)(7) as confidential.  That effectively is what Deloitte

13   is asking this Court to do.

14        Your Honor, we would not object to the core

15   proprietary materials as identified by Deloitte & Touche in

16   its moving papers – we wouldn't object to a limited

17   protective order as to that type of material, should the

18   Defendants subpoena that material, but as of yet we don't

19   have it.

20        Finally I think it is an important point to

21   consider that this is a law enforcement proceeding and given

22   the nature of the SEC's mission we try to insure

23   transparency in the securities markets, we bring public

24   interest law enforcement actions in the public's name and

25   the public therefore has a unique interest in monitoring

1  that the conduct of litigation being brought in its name.

2        So that's essentially our position on Deloitte &

3  Touche.  We don't have as huge a problem with a protective

4  order as to proprietary materials but the audit materials we

5  have are not proprietary, and that's essentially our

6  position, Your Honor.

7        **THE COURT:**  All right.  What about their position

8  as reflected in their motion and as supported by the

9  affidavits attached thereto that because the audits follow

10  these proprietary materials and manuals and guides that they

11  reflect this proprietary information?  You've asserted that

12  not all of the information is proprietary material but you

13  haven't produced any evidence in support of that.  I don't

14  have the materials before me.  I can't know from the state

15  of the record what they consist of other than what you told

16  me that some of the materials do constitute just e-mails

17  back and forth, but with regard to the actual audit

18  materials, what about their argument that these audit

19  materials reflect a process that they use which comprises

20  the proprietary materials?

21        **MR. GALLOWAY:**  Your Honor, as I understand their

22  argument they're saying that certain specific audit

23  materials related solely to the i2 audit work may contain

24  incidental references to proprietary firm-wide audit

25  methodology.  I think it's important to note that it's

 1   Deloitte's burden, of course, to show specific reasons for a

 2   protective order, they're not conclusory stereotype

 3   statements according to the Fifth Circuit, and so while we

 4   have not submitted any material in opposition, I don't think

 5   they've pointed out anything with any specificity that would

 6   constitute that type of protectable information.

 7        **THE COURT:**  Well, they contended their check lists

 8   and materials are proprietary and the audit follows this

 9   check list.  Doesn't that reflect proprietary material?

10        **MR. GALLOWAY:**  It could, Your Honor, but the fact

11   is there's a strong public interest and one of the cases we

12   cited in our brief in full disclosure of accountants'

13   professional services, and while we have no argument that

14   their overall firm-wide audit methodology may well

15   constitute a trade secret, when you balance these incidental

16   references – and that's at most what we're dealing with

17   here, and I can represent to the Court that principally what

18   we have are e-mails among the Defendants and other i2

19   employees, but when you balance that against the strong

20   public interest recognized by the Supreme Court in

21   understanding what an accountant's professional services

22   have been, I think that those incidental references are

23   clearly outweighed.

24        **THE COURT:**  Are you disputing that they have

25   produced approximately 75,000 documents, if that was the

1  number in this particular motion?

2        **MR. GALLOWAY:**  No, Your Honor, I haven't counted

3  them but they have produced a large volume.

4        **THE COURT:**  All right.  And, I understand your

5  argument about the public interest and I've looked at the

6  case that you've cited, Lagosch, (phonic) but that appears

7  to me to relate solely to materials filed in support of

8  summary judgment.  It talks about judicial documents.

9  That's not what we have here.  What we have is discovery and

10 we have a large number of documents that are being produced

11 by a third party.

12       Help me understand why it's not more efficient at

13 this point to allow those documents to be designated

14 confidential and then to the extent that SEC wants to use

15 certain documents to challenge the confidentiality

16 designation and put the burden at that point on Deloitte &

17 Touche to show the Court why they shouldn't be disclosed.

18       **MR. GALLOWAY:**  Your Honor, you know, I think

19 Deloitte & Touche is situated a little bit differently than

20 i2.  That is a party who is coming here having committed no

21 wrong doing, and we recognize that if the Court believes

22 that that is the most efficient mechanism, I frankly can't

23 argue with it.  It's our policy that we conduct our

24 litigation in full public view, and that's the SEC's policy,

25 but if the Court believes that a more protective order is

1   warranted, then I can't argue that that's not the most

2   efficient way.

3           THE COURT:  I think that based on the affidavits,

4   and granted, they're not as detailed perhaps as they could

5   have been, but I think there is sufficient details to

6   support a finding that the materials are confidential and

7   proprietary, but I think they've met their burden to

8   establish that, and I think for the purposes here, because

9   this is discovery and we're talking about producing them to

10  the Defendants, and they don't have an objection to a

11  protective order, I'm inclined to grant the motion for a

12  protective order, but before I do I'd like to hear from

13  Deloitte & Touche regarding your allegation that a large

14  part of these materials are e-mails are non protected

15  materials.

16          MR. STAMMEL:  Your Honor, Matt Stammel for

17  Deloitte & Touche.  You've really raised all the issues I

18  had intended to raise and the mechanism that the Defendants

19  saying go back to into whatever briefs, but as far as

20  bringing back the documents, if the SEC or the Defendants

21  intend to use the documents, they bring that up to Deloitte

22  and say is this really confidential, do you need to keep

23  this privileged, was the very same turn around and the

24  confidentiality order basically implies a window in which

25  Deloitte has to first try to agree and then failing that to

1    file a motion, so it's a very quick turn around so the

2    parties aren't slow in the litigation process.

3            As far as your question about whether a large part

4    of these are e-mails, I will tell you there are 60 boxes of

5    documents which I went through on a very high level with an

6    associate the other day.  There are a lot of e-mails in

7    there but there's also a lot of source documents from i2 and

8    there's a tremendous amount of Deloitte & Touche's work

9    paper related to work on those e-mails, and I would liken

10   this, as you too recognize that these are our confidential

11   and proprietary processes.  What we have here are desk

12   files, computer files, cabinet drawers full of the auditor's

13   papers.  They've covered everything top to bottom, so what

14   it is is it's essentially like lifting the lid off of a

15   factory and see how certain things are manufactured, and it

16   exposes Deloitte & Touche's audit process.  What happened to

17   those, how that information is gathered, how it's followed

18   up on, how it's integrated into Deloitte & Touche's system,

19   how it's separated, what type of things are followed up on.

20   All of those matters are revealed by the totality of these

21   documents.

22           The protective order and the process that the

23   Defendants i2 and Deloitte have worked out to analyze

24   certain documents on a one-on basis - we'd really like to

25   file this and don't want to file them under seal, we need to

 1    use this at a hearing, a document considered by itself

 2    likely isn't going to be objectionable to Deloitte because

 3    it doesn't reveal the audit methodology as a whole.  What

 4    these 75,000 pages do is it gives a competitor, it gives i2,

 5    it gives other audit firms a really good idea of what

 6    Deloitte & Touche does in an audit, and as the cases we've

 7    cited show, that's a protected trade secret and that's what

 8    the affidavits was meant to establish.

 9         **THE COURT:**  All right.  You're not disputing their

10    position that you really don't have any standing to assert

11    privilege on behalf of i2, and they're here and ready to do

12    that for themselves?

13         **MR. STAMMEL:**  Absolutely.  Our concern a service

14    provider is to not do something that would run afoul of our

15    clients.  We just want to make sure that they have an

16    opportunity to say the documents are worthy of protection;

17    that they have their say in that.

18         **THE COURT:**  Now the Defendants have submitted

19    their own proposed protective order and I compared it to

20    your proposed protective order and it seems to me that some

21    of the provisions there requesting – I understand the

22    position about wanting to have one similar protective order.

23    Have you looked at their protective order?

24         **MR. STAMMEL:**  Absolutely, Your Honor.  We worked

25    on it together.  There was a series of conference calls and

1   we've all agreed on it and we would support the entry of

2   that protective order.

3            **THE COURT:**  The Defendant – the one that –

4            **MR. STAMMEL:**  The Defendants'.

5            **THE COURT:**  The Defendants'.

6            **MR. STAMMEL:** Unless it was changed and I don't

7   think it was but it was the one that we all talked about on

8   the phone and was submitted to Deloitte would support the

9   entry of that protective order.

10           **THE COURT:**  The only real difference I saw between

11  their submitted protective order and yours is that yours

12  requested notice if documents or protected materials were to

13  be used in open court at a hearing, and while theirs

14  referenced that, you didn't provide a period for notice to

15  object and to allow the Court to determine whether it needed

16  to be sealed.  Has that been resolved?

17           **MR. STEMMEL:**  Frankly, Your Honor, I cannot

18  remember exactly how that came out but I thought we got it

19  to a comfort level that if a party was going to ask that a

20  document be admitted that they would have to do that under

21  seal.  I thought that's how that –-

22           **THE COURT:**  That's what the Defendants' submitted

23  order says.  Yours in I think it's Paragraph 6(b) says if

24  you're going to use it in open court at a hearing, at any

25  pretrial hearing, you need to give notice so that we can

1    seek an opportunity to have that hearing sealed, or have

2    that portion of the record sealed, while their proposed

3    order says – it's Paragraph 7, if you want to use it at a

4    hearing the documents are to be filed under seal but there's

5    no mention of what's going to happen at the actual hearing,

6    so if you worked it out with them and this is fine, then

7    that's all I need to know, but I just wanted to make sure we

8    don't get any surprises later on and then . . .

9         **MR. STEMMEL:**   Right.   Subject to being clarified

10   by the other lawyers.   I think that the intent there was

11   that because we're trying to reach a compromise on this that

12   i2 and Deloitte had gotten to a comfort level that the

13   parties would act in good faith, if you will, and not

14   overtly and openly try to get trade secrets out there just

15   for the sake of getting trade secrets out there, and I think

16   that's for the purpose of compromise how we saw this.

17        **THE COURT:**   Okay.   So at this point Deloitte &

18   Touche has no objection to the proposed protective order

19   submitted by the Defendants?

20        **MR. STAMMEL:**   That's right, Your Honor.

21        **THE COURT:**   All right.   I previously granted the

22   motion to intervene.   I think with regard to the Motion for

23   Protective Order on behalf of Deloitte & Touche, I think

24   that Deloitte & Touche have met its burden to establish that

25   the information sought is confidential and proprietary, and

1  balancing the factors given the amount of documents that

2  we're talking about, and Deloitte & Touche's status as a

3  third-party, I'm granting the motion for a protective order

4  and I will be entering the proposed protective order agreed

5  to by the parties and which is attached to the Defendants'

6  response.  That will be entered later today, and I believe

7  that that order is applicable to all parties to the

8  litigation; is that correct?  Is there any dispute about

9  that, Mr. Galloway, that it does also bind the SEC?

10         **MR. GALLOWAY:**  Yes, that's correct.  One point of

11 clarification, Your Honor, is you're limiting that solely to

12 the Deloitte & Touche material; is that correct?

13         **THE COURT:**  Well, I'm only taking up their motion,

14 but as far as I'm concerned, this order – it appears that

15 the Defendants and Deloitte & Touche have agreed to the

16 terms of this order.  I understand the SEC doesn't agree to

17 any order but right now we're only dealing with Deloitte &

18 Touche.

19         All right, so that will be entered later today.

20 That's the order that's Exhibit A to Defendants' response to

21 i2 Technologies' and Deloitte & Touche's motions for

22 protective order.

23         All right, anything else on that motion that we

24 need to address with regard to Deloitte & Touche?

25         **MR. STAMMEL:**  Not from me, Your Honor.

1            **THE COURT:**  Mr. Galloway?

2            **MR. GALLOWAY:**  No, Your Honor.

3            **THE COURT:**  And I see that counsel for the

4    Defendants are here in the courtroom.  I think you probably

5    want to go ahead and enter your appearances for the record

6    just to reflect that you're here, and I'd like to have you

7    also put on the record that you do agree to this protective

8    order.

9            **MS. O'CONNOR:**  Your Honor, Mary O'Connor with

10   Akin, Gump Strauss Hauer & Feld.  We too are here

11   representing Gregory A. Brady, and we do agree to the entry

12   of that protective order as to Deloitte & Touche.

13           **MR. GIBSON:**  Your Honor, Michael Gibson – oh, Ed.

14           **MR. KOPPMAN:**  For the record, Your Honor, I am Ed

15   Koppman with Akin Gump, counsel for Greg Brady.

16           **THE COURT:**  All right.

17           **MR. GIBSON:**  Your Honor, Michael Gibson

18   representing Bill Beecher and we enter an appearance for

19   purposes of this hearing and we do agree to the order.  We

20   were a part of the group that settled it and we agree that

21   the Court may enter it.

22           **THE COURT:**  All right.

23           **MR. GIBSON:**  And David Meadows from my office is

24   here also for Mr. Beecher.

25           **THE COURT:**  All right, thank you.

1    **MR. PEARSON:**  Eric Donovan Pearson representing

2  Reagan Lancaster.  We also agree to the terms of the order,

3  Your Honor.

4    **THE COURT:**  Then that order will be entered.  All

5  right, let's take up i2's motion.  I have several questions

6  for you.

7    **MR. WELCH:**  Okay.  Jim Welch, Your Honor, with

8  Brown McCarroll representing i2.

9    **THE COURT:**  All right.  The SEC is contending that

10  you have produced some of this information prior to the

11  entry of the agreement, which is attached to your appendix

12  as Exhibit B, I believe, and that really what they thought

13  was at issue were the Baker Botts materials.  Now I've

14  looked at that agreement and it looks like you tried to make

15  it applicable to what had previously been produced but it's

16  not completely clear if that's the documents that are being

17  referred to that are the non Baker Botts documents, so tell

18  me what's been produced, when it was produced, and what it

19  was produced subject to.

20    **MR. WELCH:**  Your Honor, yes.  Do you have a copy

21  of the agreement?

22    **THE COURT:**  Right here.

23    **MR. WELCH:**  The agreement specifically references

24  the documents that were produced as part of the internal

25  investigation that was conducted.  At the end of that first

1  paragraph there had been documents previously produced, and

2  there's case law cited in our brief that suggests that

3  that's not any waiver if you produce documents prior to the

4  entry of an order.  But at the end of that first paragraph

5  it says in addition, as you know, the audit committee and

6  the company both have previously provided information and

7  other documentation to the staff.  These previously produced

8  materials are also to be treated as confidential.  That very

9  next line then also contemplates producing documents after

10  the date of this agreement and I would suggest then that all

11  documents, those produced prior to, at this time and

12  thereafter, are subject to this agreement, and as you have

13  noted I'm sure on the back that this was entered into by not

14  only the SEC but the company as well as the audit committee

15  of the company's board of directors.

16          And Your Honor, if it had just been the internal

17  investigation materials, there would have been no reason for

18  the company to even sign off on that.  It would just be

19  limited to the audit committee.

20          **THE COURT:**  All right.  The SEC is alleging that

21  based on the age of the documents, and given that the

22  documents were created several years ago, that at this point

23  in time there's no need to treat them as confidential any

24  longer, given how quickly technology changes, and I'd like

25  for you to address that argument.

1          **MR. WELCH:**  A few things.  One, they don't point

2  out any documents which are now obviously stale I think is

3  how they referred to them, and undoubtedly there would be

4  some documents if we went through all 500,000 pages.  We'd

5  probably find some documents that are no longer fresh or in

6  need of protection.  However, given the long list of the

7  documents and the types of documents that are involved, some

8  of those are still documents that would cause i2 harm in the

9  market place if they were revealed to any competitors or

10  other businesses who are just trying to get access to the

11  documents for some sort of competitive or business

12  advantage.

13          **THE COURT:**  Are these the same documents that were

14  at issue in the – is it _**Shiner**_, _**Shiner**_ case?

15          **MR. WELCH:**  Many of the documents will be the

16  same.  The issues were virtually the same, and also although

17  the SEC's response brief isn't clear on this point, the

18  documents aren't limited to documents dated in the year 2000

19  or 2001.  They go beyond that into 2003, and there is a

20  continuing request for documents, so these are not all

21  documents that are five years old.  Some of the documents

22  are much newer than that.

23          **THE COURT:**  It looks to me from the language of

24  the agreement that the SEC has a very broad discretion as to

25  how to use those documents that determines that disclosure

1   is otherwise required by law or be in furtherance of the

2   Commission's discharge of its duties and responsibilities.

3   Haven't you pretty much given the leeway to use these – how

4   they see they need to use them?

5        **MR. WELCH:**  I wouldn't say how they see fit but we

6   certainly don't object to their use of these documents in

7   any litigation they're involved in, which is this case.  We

8   recognize they have an obligation to produce the documents

9   in this case to these defendants.  We don't dispute that.

10  They can enjoy the unfettered use of the documents as they

11  argue in this case, but there's no reason why they should

12  not agree to a protective order so that others use them

13  outside the case.  That wasn't part of our agreement.  Their

14  ability to do that now really renders the whole agreement

15  meaningless.  If they simply can sit back and let others

16  come and look at the documents because they're using them in

17  another case, then the fact that all of the parties went to

18  this trouble to enter into this agreement would be rendered

19  meaningless at this point, and Your Honor, if I might,

20  that's just on the issue of this agreement.  This is not the

21  only basis for a protective order.  It's a routine matter in

22  most cases.  Most of the time parties agree to them.  The

23  Defendants have all agreed to it.  As you just discussed

24  with Deloitte's counsel, Deloitte, i2 and all the Defendants

25  agreed to a form of order, and a form of order, by the way,

1   very similar to the form of order that the SEC has agreed to

2   in another case.  We modeled it after that, and although

3   there's some variances, it's very similar to that.  It's not

4   as if they've never made this agreement before, and so the

5   fact that they may have a policy, apparently there are

6   exceptions to the policy, but i2 has met their burden.

7   They've submitted affidavits describing the types of

8   documents that are included in this half a million pages,

9   and clearly not every document in that half a million pages

10  is something that warrants protection, but like Deloitte to

11  go through 500,000 pages and engage in a process with the

12  SEC over which ones should be protected and which ones

13  shouldn't, is not the most efficient way to proceed.  i2

14  submitted affidavits from both John Harvey and Cathy

15  Bonichelli (phonetic) that describes some of the types of

16  documents that are included in here.

17          The SEC does spend a lot of time in their response

18  arguing the customer and price list don't warrant protection

19  at this point, and without arguing that point they ignore

20  the long list of other materials that was included in that

21  affidavit, and that list – internal communications, and

22  counsel for the SEC sort of dismissed e-mails as being

23  anything warranting protection, but in this date there's no

24  difference between an e-mail and any other type of document.

25  The fact that it's an e-mail doesn't make it less

1   protectable.

2        Communications with customers regarding

3   capabilities and integrated nature of the software.  That's

4   the very type of document that Judge Sanders specifically

5   referenced in the ***Shiner*** case.

6        Information regarding i2's intellectual property,

7   certainly they don't – although they gloss over it, they

8   don't dismiss the fact there is reference – there are

9   references to i2's intellectual property in there.  There's

10  information regarding i2's product development, i2's product

11  release processes, and processes is not something that ever

12  becomes stale, the way you run your business, the way you

13  operate, much like Deloitte's processes in auditing.  Those

14  don't become stale by age.  Product functionality maps,

15  commission analysis of product release management and

16  product marketing processes, again something that doesn't

17  become stale.  Strategic plans are not typically short-term

18  one-year type plans.  They include long range plans.

19       Personnel files and records, those weren't

20  specifically mentioned but they were specifically requested

21  by the SEC in their investigation, and although they

22  promised to protect those – the confidentiality, I don't

23  think that's sufficient in this case, and of course, the

24  investigative materials.  Those are all materials described

25  in the affidavits.  There is nothing to controvert any of

1  that and certainly good cause would be shown to protect that

2  information.

3        **THE COURT:**  Now, would you agree with me that

4  you've waived any confidentiality as to the documents that

5  were attached to your Motion to Dismiss?

6        **MR. WELCH:**  Attached to the Defendants' motions?

7        **THE COURT:**  Weren't there documents that were

8  attached to – was it Defendants' Motion to Dismiss or your

9  Motion to Dismiss?

10        MR. STEMMEL:  Your Honor, it was the Defendants'

11  Motions to Dismiss.  It was the three defendants in this

12  litigation.

13        **THE COURT:**  Oh, the Defendants' motion.  Okay.

14  Was it in the prior litigation where your client was the

15  Defendant?

16        **MR. WELCH:**  Yes, i2 was the Defendant in the

17  ***Shiner*** litigation.

18        **THE COURT:**  That's as I recall, so if there were

19  documents that were attached to the motion to dismiss in the

20  ***Shiner*** litigation was that Motion to Dismiss sealed or were

21  those documents sealed or were they made public?

22        **MR. WELCH:**  Your Honor, it was the complaint that

23  was at issue in that case and Judge Sanders redacted – had

24  those parties redact the complaint, and then make public the

25  redacted version.

1          **THE COURT:**  Okay.  And I recall that from the

2    opinion that was attached to the SEC's appendix, but what

3    I'm saying is that if the – if i2 filed a motion to dismiss

4    in that lawsuit and attached documents, were those documents

5    sealed?  Was that pleading also sealed or was it a part of

6    the record.

7          **MR. WELCH:**  Your Honor, I wasn't involved in that

8    litigation so I really – I don't know and can't answer that.

9          **THE COURT:**  Okay.  Have you looked at the proposed

10   protective order submitted by the Defendants in this case?

11         **MR. STEMMEL:**  I have and we, like the Deloitte &

12   Touche lawyers, participated in working that agreement out.

13         **THE COURT:**  All right.  So if I were to decide

14   that a protective order is appropriate in this case you

15   don't object to the form submitted by the Defendants?

16         **MR. STEMMEL:**  That's correct, we agree with that

17   form.

18         THE COURT:  All right.  Mr. Galloway, tell me

19   about the Motion to Dismiss and the documents attached to

20   it.

21         **MR. GALLOWAY:**  Okay.  I'm not familiar with the

22   private litigation of what i2 may have attached to its

23   Motion to Dismiss.  I'm confident that i2 did move to

24   dismiss but I don't know what they attached.  What I can

25   tell you --

1        MR. WELCH:  Your Honor, if I might, we're not

2   adopting what's attached to that motion.

3            **THE COURT:**  Okay.

4        **MR. GALLOWAY:**  What I can tell you, Your Honor, is

5   that i2 was involved - because they were trying to exhibit

6   cooperation with the SEC's investigation, i2 was involved in

7   – was well aware of the litigated enforcement action against

8   the three Defendants here.  This was filed in July, and in

9   our complaint we specifically quoted documents that i2 now

10  contends are confidential.  Not only that, we put out a

11  litigation release so even if i2 somehow had missed the fact

12  that the case had been filed in open court, we put out a

13  press release on our website.  The Defendants here have

14  indeed filed voluminous documents and their appendices and

15  defense in support of their motions to dismiss the SEC's

16  complaint, i2 has never once made any claim that those

17  documents were confidential.

18        Indeed when the subject of confidentiality first

19  came up it had only to do with the Baker Botts materials.  I

20  thought it was only fair, because there was an agreement,

21  that i2 ought to be able to make whatever arguments it

22  thought it had, so I notified counsel, and at that time,

23  those are the only documents we discussed.  It was not until

24  December 21st, after 200 boxes of documents that i2 has now

25  claimed are confidential, had already been produced to the

1  Defendants that i2 made clear that they were now trying to

2  cast a very wide net with that confidentiality agreement and

3  cover all the documents.

4       So I think under those circumstances there has

5  been a waiver.  What's more I understand from counsel for

6  Kmart that these very same documents are at issue and have

7  been at issue for months in the Kmart litigation and that i2

8  has not once argued that any of these materials are

9  proprietary or confidential.

10       **THE COURT:**  Well, I saw the letter in your

11  appendix but I don't really have anything before me on the

12  Kmart litigation and that's really not a factor for me to

13  consider, and if Kmart needs the documents they certainly

14  are free to seek them from the Court for that litigation

15  pending.

16       To the extent you can show me something that says

17  - or show me where they've taken an inconsistent position in

18  another lawsuit, that's different but what's attached to

19  your appendix is Kmart's response to i2's discovery

20  requests.  There's nothing from i2.

21       **MR. GALLOWAY:**  What I can show you, Your Honor, is

22  the multitude of transmittal letters that i2, through its

23  counsel Deckard, LLP from Washington, D.C., submitted when

24  producing documents, they never referenced the

25  confidentiality agreement.  In contrast, Baker Botts, which

1    represented i2's audit committee, routinely – and I believe

2    in every instance – referenced the confidentiality

3    agreement, which I think demonstrates that all the parties

4    have the same understanding.  Certainly the Commission never

5    intended to agree with i2 that all these 200 boxes of

6    documents were confidential, and I think based on their own

7    transmittal letters it's clear that they shared that

8    understanding, Judge.

9         **THE COURT:**  Well, I'd like to see those

10   transmittal letters because I don't recall seeing them in

11   the appendix, and the other point I wanted to make is that

12   the language of the confidentiality agreement is pretty

13   broad as to that too.  I mean they clearly asked to make all

14   documents produced before, designated as confidential, and

15   it's signed off on by the SEC, so it looks like the SEC is

16   taking an inconsistent position here from the documents

17   rather than i2.

18        **MR. GALLOWAY:**  Your Honor, if I may approach?

19        **THE COURT:**  Absolutely.  Has opposing counsel seen

20   these?

21        **MR. GALLOWAY:**  I have provided them to them.  They

22   are in the box in front of Mr. Welch.  What you have in

23   front of you, Your Honor, are, like I said, a multitude of

24   letters from Deckard and not once to my knowledge did

25   Deckard ever reference the confidentiality agreement in

1   producing documents on behalf of its client, i2

2   Technologies.  On the other hand – now they did seek FOYA

3   protection, which is a completely separate matter, which

4   I've addressed in our response.  On the other hand, Baker

5   Botts, there is a tab I believe in the materials before you,

6   Your Honor, that separates what's Baker Botts from Deckard.

7   The Baker Botts materials clearly, always references the

8   confidentiality agreement, and that, of course, is entirely

9   is consistent with what our understanding was all along.

10          **THE COURT:**  All right.  Rather than take time on

11  the record to go through this, you're not disputing that

12  they sought to keep the Baker Botts materials confidential

13  through the agreement?

14          **MR. GALLOWAY:**  During the investigation, yes, Your

15  Honor, that's true.

16          **THE COURT:**  All right.  The dispute here is

17  whether – as far as the agreement, the confidentiality

18  agreement that was signed in May, what you're contending is

19  that all of the non Baker Botts materials they did not seek

20  confidential protection for those?

21          **MR. GALLOWAY:**  That is certainly my position and

22  it frankly came as a flash to me on December 21st when I

23  received the letter that I saw they took a different

24  position that was dramatically different from all the

25  letters that you see before you.

1          **THE COURT:**  Okay.  Now, on your website was it

2   just a press release or discussion of the investigation or

3   have you actually posted these documents?

4          **MR. GALLOWAY:**  No, the documents themselves are

5   not posted.  My only point there, Your Honor, was to suggest

6   that i2 – but none of this has been conducted in secret.  i2

7   has been aware of everything that the SEC has done in

8   connection with this investigation and the subsequent

9   litigation.

10          **THE COURT:**  Has the SEC produced documents that

11   were turned over by i2 to any party at this point?

12          **MR. GALLOWAY:**  No.  The only use we've made of

13   those documents is, for instance, when we took investigative

14   testimony from Karen Austin, who is a representative of

15   Kmart, she was shown certain documents, and of course, we

16   had to show those in the discharge of our duties, but as far

17   as producing documents, no, we haven't produced them to

18   anyone other than the three Defendants in this lawsuit.

19          **THE COURT:**  So you have produced them to the three

20   Defendants in this lawsuit?

21          **MR. GALLOWAY:**  Yes, Your Honor.  Let me be clear.

22   During three weeks in December we made available all 200

23   boxes of documents produced by i2 and all of those documents

24   have been produced and reviewed by defense counsel before

25   Ms. Bonichelli (phonetic) sent her December 21st letter

1  taking this new position that all the documents were covered

2  by the confidentiality agreement.

3       **THE COURT:**  All right.  Were the Baker Botts

4  materials produced to the Defendants?

5       **MR. GALLOWAY:**  No, Your Honor, they were not.

6       **THE COURT:**  Okay.  So you have produced the non

7  Baker – I think that was the terminology that you used in

8  your response and that's I think an appropriate description

9  you used – the non Baker Botts materials that you received

10  from i2 were produced to the Defendants in December but the

11  Baker Botts materials have not been produced?

12       **MR. GALLOWAY:**  That's correct.  Now, just to – I

13  hate to muddy it up further, Judge, but in the last week all

14  the parties have agreed that they would maintain the

15  confidentiality of even Baker Botts materials pending this

16  court's ruling because I wanted to produce those documents

17  as expeditiously as possible.  I have made them available

18  but I would suggest that certainly there has been no waiver

19  on the Baker Botts materials.

20       **THE COURT:**  All right, but certainly prior to the

21  filing of the motion the Baker Botts material has been

22  treated as confidential by the SEC pursuant to the

23  agreement?

24       **MR. GALLOWAY:**  Your Honor, we have tried to afford

25  them an opportunity to be heard.  We never took the position

1    that they were confidential in the sense that we didn't have

2    the – we didn't have the ability to use them in the

3    litigation as we see fit in furtherance of our duties as

4    expressly set forth in the original.

5              THE COURT:  Well, you considered them subject to

6    the agreement.  You didn't produce them in December with the

7    other non Baker Botts materials.

8              MR. GALLOWAY:  That's correct, Judge.

9              THE COURT:  Okay.  Now, tell me about the notice

10   that i2 had that the non Baker Botts materials were being

11   produced to the Defendants.

12             MR. GALLOWAY:  Your Honor, I can't point you to a

13   document.  All I can tell you is that I spoke to Cathy

14   Bonichelli (phonetic) on a number of occasions in November

15   of 2005 and we focused exclusively on the Baker Botts

16   materials.  It was plain that the document production was

17   forthcoming.  As to all the documents, Ms. Bonichelli

18   (phonetic) never once said that all these other documents

19   are subject to any sort of protection.  As I mentioned to

20   the Court, when I got her letter on December 21st I was

21   somewhat taken aback.

22             THE COURT:  Had any Baker Botts materials been

23   produced by i2 prior to the entry of the confidentiality

24   agreement?

25             MR. GALLOWAY:  I'm not sure I understand the

1    question, Your Honor.

2          **THE COURT:**  All right.  Let me see if I can back

3    it up.  The confidentiality agreement appears to have been

4    signed on or about May 28th, 2003.  That's the one that's

5    attached to i2's appendix as Exhibit B.

6          **MR. GALLOWAY:**  Yes.

7          **THE COURT:**  Prior to the execution of this

8    agreement, had i2 turned over any Baker Botts materials to

9    the SEC?

10         **MR. GALLOWAY:**  Not to my knowledge.  They had

11   produced thousands of pages of other documents.  The

12   investigation had been ongoing for six months prior to that

13   confidentiality agreement but I don't believe any Baker

14   Botts materials had been produced.

15         **THE COURT:**  Okay.  So when it says in the

16   agreement previously produced materials, that did not refer

17   to any Baker Botts materials that had been produced before?

18         **MR. GALLOWAY:**  To my knowledge, no, Your Honor.

19         **THE COURT:**  So that tends to support their

20   argument that they intended those – that non Baker Botts

21   materials to also be covered by the agreement, if that's

22   what had been produced at that point.

23         **MR. GALLOWAY:**  That certainly – it was not our

24   interpretation.  That may well have been theirs.  I think

25   the fact that their letters referenced – later didn't

 1  reference those – the confidentiality agreement bears on

 2  what their intention was, but in any event, as the Court has

 3  pointed out, that agreement is quite clear that the SEC can

 4  use those documents in furtherance of its duties.

 5       **THE COURT:**  All right.  Tell me how – tell me why

 6  you oppose entry of a protective order at this point.  If

 7  we're talking about discovery of these documents and making

 8  them available to the Defendants for their use in the

 9  litigation, what's the issue here?  How does the SEC intend

10  to use them to discharge its duties and responsibilities

11  that would violate that protective order if it was entered?

12       **MR. GALLOWAY:**  Well, for example, Judge, filing

13  motions for summary judgments.  Any number of pretrial

14  motions that might be filed when we have a sealing order

15  places a tremendous burden, particularly on an agency like

16  ours, which is, you know, we don't have near the resources

17  that the Defendants have, but we just don't think that it's

18  warranted to have a protective order in this case.  They've

19  got to demonstrate a specific reason for it, and thus far

20  all I've heard are conclusory statements.

21       **THE COURT:**  Well, they've got some specifics in

22  the affidavits and Judge Sanders has agreed with them that

23  this type of information – he's previously agreed with them

24  that this very type of information as represented by Mr.

25  Welch, some of this very same information is protected.  Why

1    doesn't that meet their burden to show that that's

2    confidential?

3          MR. GALLOWAY:  Well, first and foremost it's

4    stale.  The conduct at issue in this case occurred in 2000

5    and 2001.  To the extent their documents from '03, they

6    relate back to the earlier misconduct by i2, and when Judge

7    Sanders considered this he had before him an agreement among

8    all the parties in the case – and that was in November of

9    2003 and here we are in January of '06, the documents are

10   far more outdated now than they were then.

11         THE COURT:  What about their argument that it's

12   technology or it's information that's still used.  We're not

13   talking about a computer chip that's obsolete now or

14   something like that, are we?

15         MR. GALLOWAY:  What we're talking about is a bunch

16   of e-mails primarily, Your Honor.  We're not talking about a

17   source code, we're not talking about something that a

18   competitor or somebody can get his hands on, and a perverse

19   engineer that – the software.  That's not at all what's at

20   issue here.  This is not an intellectual property case; this

21   is a fraud case and we intend to prove that the Defendants

22   knew that they were selling nonfunctional software and we

23   intend to do that by their own communications, not by

24   proving that their code – we haven't asked for any codes.

25   I'll put it that way, Judge.  That's the kind of thing in my

1  mind that could be protected.  This is – you know, this is

2  just routine business arrangement.

3        **THE COURT:**  So as I understand your argument, the

4  SEC – really how you would be harmed by a protective order

5  is that it would make it harder for you when you're filing

6  your motions for summary judgment and trying to use some of

7  these documents in court proceedings.

8        **MR. GALLOWAY:**  That and the fact that we are a

9  public agency.  We bring our litigation in public interest.

10  The public has a strong interest in observing litigation

11  being conducted in its name, so this differs.  And I've

12  heard over and over how it's routine to have a protective

13  order in these types of cases but what the defense side

14  seems to be missing in my view is that this isn't a routine

15  case like a commercial dispute.  This is a law enforcement

16  proceeding.

17        **THE COURT:**  Law enforcement proceeding against

18  three former employees of a company whose documents are at

19  issue here.

20        **MR. GALLOWAY:**  A company who overstated its

21  revenues by a billion dollars, who is coming into court –

22  frankly, the equities aren't really so much in favor of i2

23  here.  It's not apparent why they need this protective

24  order.  What appears to be the reason is that they want to

25  avoid further litigation, Judge, and I understand that, I

1  don't blame them, but that's no reason for a protective

2  order.

3         **THE COURT:**  Well, that's not necessarily a reason

4  for a protective order in my mind either, but at this point

5  I think they've made their showing that the documents that

6  are at issue here, and given the scope of the production –

7  we're talking about over 500,000 documents, whether hard

8  copy or electronic format, but the proposed protective order

9  gives the parties ample opportunity and means for

10 challenging any designation as confidential, and once you

11 get to the summary judgment stage then the whole judicial

12 document open to the public's analysis can really be made at

13 that point, but I'm having trouble seeing the harm in

14 designating the documents confidential for purposes of

15 discovery, given the enormity of the amount of documents

16 here and the fact that i2 is not in this lawsuit.  I

17 understand your position about i2 but that was a separate

18 lawsuit.  Apparently that's been resolved and we've got

19 three non party or non i2 Defendants here.

20        **MR. GALLOWAY:**  That's correct, Your Honor, and

21 there is a large volume of information.  Certainly I'm not

22 shying away from that.  It's just my understanding that the

23 Fifth Circuit requires the movant to make a specific – a

24 particular and specific demonstration of fact as

25 distinguished from stereotype and conclusory statements.

1          **THE COURT:**  Uh-huh, and I think that they have

2     made that.  I think that the affidavits in support, coupled

3     with the previous finding of Judge Sanders regarding some of

4     this very same information, I think meets that standard, and

5     I am not ordering that those documents not be produced;

6     you've already got them.  I'm only ordering that the

7     documents be produced to the Defendants subject to a

8     protective order, and they don't have any objection to a

9     protective order, so I understand the position about the

10    pubic documents but I think the _**Lagosch**_, _**Lagosh**_, however you

11    pronounce that case, I think it's very distinguishable.

12    We're not talking about summary judgment materials here.

13         So, I am going to grant the motion for a

14    protective order and I'm going to enter the protective order

15    that's attached to the Defendants' motion in this case.

16         Is there anything else that we need to address

17    with regard to the motion – any pending discovery, any other

18    matters that are --

19         **MR. GALLOWAY:**  Not from the Commission's

20    standpoint, Your Honor.

21         **MR. WELCH:**  No, Your Honor.

22         THE COURT:  And from the Defendants?  I'll give

23    you an opportunity to raise any issues that we need to talk

24    about.

25         **MS. O'CONNOR:**  None, Your Honor.  We look forward

1   to obtaining discovery as soon as possible, now that the

2   protective order is being entered.

3          **THE COURT:**  I'll enter the protective order today.

4   What kind of time frame are we looking at for producing – I

5   believe the documents are ready and available to be

6   produced, it's just a matter of entering the order?

7          MR. GALLOWAY:  Yes, Your Honor.  We can produce

8   everything we have within the next day or two.

9          **THE COURT:**  Okay.  Anything else that we need to

10  discuss?  All right.  Well, thank you very much.  I'll

11  return your documents to you, Mr. Galloway, and we are

12  adjourned.

13

14                              (Proceedings Concluded)

15

16          I certify that the foregoing is a correct

17  transcript from the electronic sound recording of the

18  proceedings in the above-entitled matter.

19

20

21

Date:   June 8, 2009              /s/Betty Tate, Transcriber

22                                 3101 Townbluff #923
                                   Plano, TX  75075
23                                 972-596-9442

24

25